## RASMUSSEN v. BAKER.

Constitutional and Statutory Construction—Qualifications of
    Electors—Definition of the Term "Constitution"—Trans-
    lation of the Constitution into Another Language—Con-
    stitutional Debates as an Aid to Interpretation of the
    Constitution—Ability to Read the Constitution as a Suf-
    frage Qualification, Meaning of—Reserved Questions.

1. The primary principle underlying an interpretation of con-
    stitutions or statutes is that the intent is the vital part, and
    the essence of the law.

2. Such intent, however, is that which is embodied and
    expressed in the statute or instrument under consideration.
    If the language employed is plain and unambiguous, there is
    no room for construction.

3. It must be presumed that in case of a constitution, the
    people have intended whatever has been plainly expressed.
    Courts are not at liberty to depart from that meaning which
    is plainly declared.

4. The presumption is that language has been employed with
    sufficient precision to convey the intent.

5. The constitution derives its force from the people who
    adopted it, and it is the intention of the people which is to be
    sought for.

6. The meaning of the constitution is fixed when it is adopted,
    and it is not different at any subsequent time when a court
    has occasion to pass upon it.

7. So, the language of the constitution is to be understood in
    the sense in which it was used at the time when it was
    adopted.

8. Statutes which confer or extend the elective franchise should
    be liberally construed. The voter must, without any undue
    straining of the language in any direction, come within the
    terms of the law, and all reasonable doubts should be resolved
    in his favor.

9. Any provision which excludes any class of citizens from the
    exercise of the elective franchise ought to receive a strict
    construction, without, however, doing violence to, or distort-
    ing, the language, to the end that none shall be held excluded
    who are not clearly designated.

10. In interpreting a constitutional provision, it should be assumed that the convention which framed the instrument understood the ordinary import of the language employed.

11. Comprehensively considered, a constitution consists in the fundamental principles of government, and as thus understood it may be either written or unwritten, and the term so defined would not be inapplicable to almost any kind of human government.

12. In this country the term "constitution" is understood and received as indicating something less than that embraced in its comprehensive definition.

13. In American constitutional law, the word "constitution" is used in a restricted sense, as implying the written instrument agreed upon by the people of the Union, or any one of the States, as the absolute rule of action and decision for all departments and officers of the government, in respect to all points covered by it, which must control until it shall be changed by the authority which established it.

14. The word "constitution" as used in Sec. 9 of Art. 6 of the constitution of this State, which provides that "no person shall have the right to vote who shall not be able to read the constitution of this State," signifies a written instrument only. In that sense we have the ordinary, natural, and obvious meaning of the term, and in that sense the essential qualities of an ability to read it are to be determined.

15. Although it may be circumstantially reasonably certain that the framers of the constitution, by design, omitted from Sec. 9 of Art. 6, making an ability to read the constitution a suffrage qualification, the words "in the English language," or words of like import; nevertheless, if without the omitted words the import of the language employed would be identically the same, the mere act of omission would not unerringly point to a contrary intention.

16. If reliance be placed alone upon such an omission, if there is a palpable and definite meaning to be discerned in the language actually used, which would constitute the sense in which such language is commonly accepted, the court would not be at liberty to depart from that meaning.

17. For the reason that it is possible that the omitted words may have been regarded as unnecessary, it would be unsafe to impute to even a purposed omission, a conclusive indication of but one intent and purpose behind it.

18. The debates of the constitutional convention are not a very reliable source of information upon the subject of the construction of any particular word or provision of the constitution.

19. The debates may, for some purpose, but in a limited degree, be consulted in determining the interpretation to be given some doubtful phrase or provision, but, as a rule, they are deemed an unsafe guide.

20. The fact that English was and is the language in common and general use in the State, and that legislative enactments had uniformly been expressed and published only in that language, and that the proceedings of courts were and are conducted solely in English, and that no other language was employed in the convention, and that the constitution itself was framed and promulgated in no other language, serve to illustrate and explain the language of Sec. 9, of Art. 6, and are also important facts in the search for the purpose behind the language.

21. There is no ambiguity in the words, "the constitution of this State;" they possess and convey a meaning which is precise, clear, and certain.

22. A copy of the constitution can consist only in a reproduction of the words of which it is composed in the same relation as they are there found, and thus, as a necessary consequence, in the language in which it is written.

23. The constitution of the State having been written only in the English language, a translation thereof into another language would not constitute a copy of it.

24. The constitution itself making no provision with reference to the language in which it should be published or promulgated, there can not exist any authorized publication of that instrument in any other language than English, in which it was framed and written, for any purpose of construction or enforcement.

25. The fact that at the three general elections occurring since the taking effect of the said constitutional qualification of voters — that of an ability to read the constitution, as matter of common knowledge, citizens who could read only a translation were, without objection, allowed to vote — does not affect the construction to be given the provision, for the reason that the practice has not been indulged in for such a length of time as to give it a controlling effect in the interpretation of an unambiguous constitutional mandate.

26. In the sense of the provisions of Sec. 9 of Art. 6 of the constitution, no person is able to read the constitution of this State, who can not read it in the English language. Hence, no person is a legal voter who is not able to read the constitution in the English language, unless such incapacity is the result of physical disability, or such person had the right to vote at the time of the adoption of the constitution.

27. The statute permitting the District Court to reserve important and difficult questions to this court for its decision authorizes questions, not cases, to be certified. The case itself is not here for determination. It is here temporarily awaiting a decision upon the reserved questions. The papers must be here to disclose the fact that the reserved questions are actually involved. The question, "What judgment should be rendered in this action?" is not a proper one for reservation.

[Decided November 15, 1897.]

RESERVED questions from the District Court for Carbon County. HON. JESSE KNIGHT, Judge.

This case was pending in the District Court for Carbon County. Plaintiff and defendant were opposing candidates for the office of County Treasurer of Carbon County, at the election of 1896, and defendant was declared elected by the canvassing board by a vote of 1,189 as against a vote of 1,162 for the plaintiff. Plaintiff contested such election, principally upon the ground that in two precincts, Hanna and Carbon, certain natives of Finland, naturalized citizens of the United States who could not read the constitution of the State in the English language were permitted to vote, and voted for defendant in sufficient numbers to change the result, if their votes should be excluded. Said persons could read a translation of the constitution in the Finnish language. It was charged that said votes were illegal. The District Court reserved for the decision of the Supreme Court certain questions as important and difficult. So far as answered, the reserved questions are disclosed in the opinions which follow.

*C. E. Blydenburgh* and *N. E. Corthell*, for plaintiff.

It is apparent that the Legislatures of 1890, 1891, and 1895 understood that only those illiterates who were qualified voters July 10, 1890, were to receive assistance in marking their ballots; and that those afterward becoming qualified should be competent to mark their own ballots, and must, therefore, be able to read the ballots in the language in which they were printed.   (L. 1890 – 1891, Chap. 100, Sec. 9; L. 1895, Chap. 48.)   It is a solemn act to declare a law unconstitutional, and one to be performed with reluctance and hesitation.   (Cooley's Const. Lim., 192, 193; Slaymaker v. Phillips, 5 Wyo., 453.)   Legislative interpretation of the constitution is entitled to great weight. (Sutherland Stat. Const., 311; 5 Wyo., 453.)   This is especially true of a Legislature meeting soon after the adoption of the constitution, and whose membership included many members of the constitutional convention. (Cooley Const. Lim., 81, 85; Suth. Stat. Const., 292, 307, 309; 5 Wyo., 453.)

In construing the constitution, the whole instrument is to be examined.   The means employed are to be construed in the light of the end to be accomplished, and particular provisions are to be read in the light of the general intent.   (Cooley, 71; Kent's Com., 461; Suth. Stat. Const., 241.)   Considering the various provisions in aid of education, restrictions upon suffrage, and for the secrecy and purity of the ballot, it is evident that it was intended the voter should be able to read his ballot in the only language (English) in which it is printed.

The constitution is intended to be a practical and working instrument.   The electoral system must be enforced by ordinary means and through fallible, human instruments.   If the test is ability to read in any language, how is it to be applied in ordinary practice ?   Is it to be supposed that the members of the convention intended that the constitution should be turned into multifarious languages, and authentic copies of all furnished to the

registration and election officers in each precinct? And is it conceivable that such accomplished linguists could be found to fill these positions everywhere as to enable them to test the ability to read correctly in all languages? And, if not by these means, how otherwise can the reading requirement be practically enforced? Such is, we think, conceded to be the universal understanding of the qualification when applied to English-speaking voters; and no one, probably, would suggest that affidavits of ability to read should be accepted from voters whose qualifications could there be put to a practical and conclusive test. And, if this test is to be applied to English-speaking voters, why not to others? The great inconvenience, if not the impossibility, of thus carrying out the construction contended for by the defendant, is a well-recognized and useful test to apply in determining its reasonableness and fitness. (Suth. on Stat. Const., 324; 1 Blackstone Com., 60; Taylor v. Taylor, 10 Minn., 94.)

The interpretation which will sustain rather than destroy the constitution is to be adopted. (Suth. Stat. Const., 332.) Ability to read a particular instrument is required. This implies to read it in the English language. (Nolan v. State, 9 Tex. App., 423; Garcia v. State, 12 id., 339.) A translation is never the exact equivalent; even in the sense of the original. A difficulty would be encountered in setting up a censorship to determine what should be a sufficient translation. Reading a translation would not satisfy the constitutional requirement. The publication of a translation does not infringe a copyright. (Stowe v. Thomas, 23 F. C., 201.) Full effect must be given to the language employed. (Cooley, 72.) It was the particular class of voters involved in this case which was aimed at by the provision. (See Constitutional Debates, pp. 375, 377, 389, 391, 392, 432, 434, 435, 383, 441, 393, 390.) As verbal and contemporary expositions of the instrument, the debates were almost a part of it, and next to its own language, form the most certain and reliable key to its real meaning.

(Miller Lect. on Const., 82, 100, 102; Cooley Const. Lim., 80, 81; Suth. Stat. Const., 300.)

Underlying the educational test is a principle which has received almost universal assent. It is the policy of every enlightened country to assimilate its population, amalgamate the races, unify and purify its language, and by these and other means to nationalize its people as fast and as completely as possible. There is a moral, as well as a practical, necessity for this policy which everybody recognizes. And a frequent and effectual expedient for the accomplishment of this general policy is to withhold the political power until the citizen has become thoroughly nationalized. (1 Burgess, Political Sc., and Const. L., 42.)

*F. Chatterton*, and *Van Orsdel & Burdick*, for defendant.

Sec. 9 of Art. 6 is one of the exceptions provided for in Sec. 2 of the same article. Provisos and exceptions are to be strictly construed. (Suth. Stat. Const., 224, 297, 298; U. S. v. Dickson, 15 Pet., 141; Epps v. Epps, 17 Ill. App., 196.) The provisions requiring an ability to read as a suffrage qualification are in the nature of exceptions to the common privilege. (Suth. Stat. Const., 466, 467.) Restrictions upon the elective franchise are strictly construed. (Cooley's Const. Lim., 486.) Statutes conferring or extending the franchise are to be liberally construed. (Suth. Stat. Const., Sec. 441.)

Upon a strict construction of Section 9, who is excluded? It mentions no language. Strictly, therefore, it does not require that the voter be able to read the constitution in any particular language. The word " read " will not be confined to the English language, but an article or document may be read in the German, French, or Finnish language. The constitutional debates are valuable as throwing light upon the intention of the members of the convention in adopting the section. (Cooley's Const. Lim., 80; People v. Blodgett, 13 Mich., 127.)

The distinction in the debates was made between an ignorant or illiterate voter and an intelligent or educated voter, and it is apparent that the purpose was to deny the suffrage to the ignorant and illiterate. (Journals and Debates, Const. Conv., pp. 373, 389, 390, 453, 437, 438, 435.) Nowhere in the debates is the term used "to read in the English language," except when the author of the provision called attention to the fact that Massachusetts made such a requirement. Again, the section is taken from the Massachusetts constitution. It must be assumed that the convention was familiar with the provisions of that instrument. The fact that the words " in the English language" were omitted from our constitution, and are contained in that of Massachusetts, renders it apparent that the omission was intentional on the part of the convention. A person is not illiterate merely because he can not read English. Some of the best scholars of the time are not able to do so, but from a study of our institutions through translations in their own language, have become thoroughly acquainted with our system of government. It is not the duty of the citizen to furnish the necessary machinery for conducting an election. We can not see why an authorized copy of the constitution should not be furnished in the Finnish or any other language as well as in English. Official copies of the constitution can be provided by law in each of the different languages of the State.

The legislative acts referred to by counsel for plaintiff is not, and does not pretend to be, a construction of the constitutional provision under discussion.

(Counsel for each of the parties discussed other questions which were submitted, but the briefs upon those questions are not abstracted for the reason that the questions were not considered by the court.)

POTTER, JUSTICE.

The plaintiff brought this action in the district court to contest the election of defendant to the office of county

treasurer of Carbon County. The plaintiff and defendant were opposing candidates for that office at the election, held on the 3d day of November, 1896. According to the abstract of votes made by the county board of canvassers, the defendant was credited with 1,189 votes, and the plaintiff with 1,162 votes, and a certificate of election was issued to the defendant. The case was submitted to the district court upon an agreed statement of facts, whereupon that court ordered that certain important and difficult questions arising in said case be reserved to this court for its decision thereon. The questions thus reserved involve all the votes mentioned and specifically described in the statement of facts, upon which the legality of defendant's election is questioned. Such questions are fourteen in number. The first nine respectively and separately inquire whether or not the votes mentioned in paragraphs five (5) to twelve (12) inclusive and in paragraph seventeen (17) of the statement of facts are legal votes. The tenth and eleventh questions seek the decision of this court respecting the number of votes, if any, which should be deducted from the votes returned and abstracted for the plaintiff and defendant respectively ; and the twelfth and thirteenth, the number of legal votes received by the plaintiff and defendant respectively. The fourteenth question, which is general, and embraces all the others, is, "What judgment should be rendered in this action?"

The principal point of controversy in the case arises in relation to the first and sixth reserved questions. Question No. 1 is, "Are the votes mentioned in paragraph five of the statement legal votes?" Paragraph five of the statement reads as follows : "At said election in precinct No. 1 of Election District No. 6, of said county, known as Hanna Precinct, fifty-four votes were cast for the said defendant by natives of Finland, naturalized citizens of the United States, who were not able to read the constitution of the State of Wyoming in English, and who were not prevented by physical disability from complying

with the requirements of Sec. 9, Art. 6, of the constitution of the State of Wyoming, and who did not have the right to vote in the Territory of Wyoming, at the time of the adoption of the constitution of said State, but who could read a proper translation or interpretation of such constitution in the Finnish language, which said votes were by the judges of election in said precinct counted and returned for the said defendant.''

Question No. 6 refers to the votes mentioned in paragraph No. 10 of the statement, and that paragraph presents similar facts as in paragraph five with respect to fifty votes cast for defendant at Carbon Precinct.

A determination respecting the legality of the votes mentioned in the said two paragraphs depends upon the import of that provision of our constitution which requires what is known as an educational qualification for the right of suffrage.

The particular constitutional provisions affecting this matter are as follows: '' The rights of citizens of the State of Wyoming to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this State shall equally enjoy all civil, political, and religious rights and privileges.'' (Art. 6, Sec. 1.)

'' Every citizen of the United States of the age of twenty-one years and upwards who has resided in the State or Territory one year, and in the county wherein such residence is located sixty days next preceding any election, shall be entitled to vote at such election, except as herein otherwise provided.'' (Id., Sec. 2.)

'' *No person shall have the right to vote who shall not be able to read the constitution of this State.* The provisions of this section shall not apply to any person prevented by physical disability from complying with its requirements.'' (Id., Sec. 9.)

''Nothing herein contained shall be construed to deprive any person of the right to vote who has such right at the time of the adoption of this constitution,

unless disqualified by the restrictions of Section 6 of this Article.    After the expiration of five years from the time of the adoption of this constitution none but citizens of the United States shall have the right to vote." (Id., Sec. 10.)

Section 6 excludes from the elective franchise all idiots, insane persons, and persons convicted of infamous crimes, unless restored to civil rights.    It is further required that all elections shall be by ballot; that the legislature shall provide by law for the printing of the names of all candidates for the same office to be voted for at any election upon the same ballot at public expense, to be delivered on election day to the voters within the polling place by sworn public officials, and that only such ballots shall be received and counted, the privilege being saved to the voters, however, of writing upon the ballot the name of any other candidate.    Absolute privacy in the preparation of ballots is required to be guaranteed, and the legislature is required to pass laws to secure the purity of elections, and guard against the abuses of the elective franchise.

The following clause of Section 9 is the cause of this controversy.    "*No person shall have the right to vote who shall not be able to read the constitution of this State.*"    It is contended on behalf of plaintiff that this requires an ability to read the constitution in the *English language*.    On the other hand it is insisted that the clause is not restricted to that language.    The question has not been free from embarrassment.

We are profoundly impressed with its gravity and deep significance, appreciating the fact that the decision of the case at bar is but a single instance of the interests which are involved.    Not only are the votes to be affected which were cast at Hanna and Carbon in 1896, by native Finlanders, unable to read the constitution in English, but. their right as well to vote at subsequent elections, and also the qualifications of others in a similar situation, so that the question is one of vital interest to many of our

citizens from an individual standpoint, and in its possible result upon elections the entire people are concerned.

No person in this State is now permitted to exercise the elective franchise who is not a native born or naturalized citizen of the United States. If one is foreign born he must have resided in this country for such a length of time, and have become sufficiently attached to our institutions to authorize his naturalization. The question, therefore, is whether such a person otherwise qualified is denied the right to vote because his acquaintance with the English language is too limited to enable him to read the constitution in that language, notwithstanding that he has learned to read in his own language, and in such language can read the constitution.

The primary principle underlying an interpretation of constitutions or statutes is that the intent is the vital part, and the essence of the law. (Sutherland Stat. Const., Sec. 234, People v. Potter, 47 N. Y., 375.) "The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it. In the case of all written laws, it is the intent of the lawgiver that is to be enforced." (Cooley Const. Lim., 55.) Such intent, however, is that which is embodied and expressed in the statute or instrument under consideration. "The intent must be found in the instrument itself." (Cooley Const. Lim., 55; Sutherland Stat. Const., Sec. 234.) If the language employed is plain and unambiguous, there is no room left for construction. It must be presumed that in case of a constitution the people have intended whatever has been plainly expressed. Courts are not at liberty to depart from that meaning which is plainly declared.

The remarks of Mr. Justice Bronson in People v. Purdy, 2 Hill, 35, have been frequently quoted with approval. Commenting upon different opinions which were held respecting the purpose and effect of a certain clause of the State constitution and the effect of departing from the language used, he said: "In this way a

solemn instrument—for so I think the constitution should be considered—is made to mean one thing by one man, and something else by another, until, in the end, it is in danger of being rendered a mere dead letter; and that, too, where the language is so plain and explicit that it is impossible to mean more than one thing, unless we first lose sight of the instrument itself, and allow ourselves to roam at large in the boundless fields of speculation. For one, I dare not venture upon such a course. Written constitutions of government will soon come to be regarded as of little value if their injunctions may be thus lightly overlooked; and the experiment of setting a boundary to power will prove a failure. We are not at liberty to presume that the framers of the constitution, or the people who adopted it, did not understand the force of language." In that case the question was whether the words "any body, politic or corporate," embraced all corporations, whether public or private.

In the case of the People v. May, 3 Mich., 604, the court stated the principle as follows : " Among the well-settled rules of construction of statutes are these: 1st, the natural import of the words of any legislative act, according to the common use of them when applied to the subject matter of the act, is to be taken as expressing the intention of the legislature, unless the intention so resulting from the ordinary import of the words be repugnant to sound acknowledged principles of public policy; and 2d, if the subject of the statute relates to courts or legal proofs, the words of the legislature are to be construed technically, unless from the statute itself it appears that the terms were used in a more popular sense. These rules are equally applicable in the construction of a constitution, —as the constitution is law, the people having been the legislators— as much as the statute is law, the senators and representatives being the legislators." And again, " The natural import of words is that which their utterance promptly and uniformly suggests to the mind — that which common use has affixed to them."

9

In Hawkins et al. v. Carroll Co., 50 Miss., 735, we find a statement of the same principle, as follows: "To get at the thought or meaning expressed in the statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning, which involves no absurdity or contradiction with other parts of the instrument, then that meaning apparent on the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed; and neither the courts nor the legislature have a right to add to or take from that meaning." And again, "The object of construction applied to the constitution is to give effect to the intent of its framers, and the people in adopting it. This intent is to be found in the instrument itself." (Newell v. People, 3 Seld., 97.) "It is not allowable to interpret what has no need of interpretation, and when the words have a definite and precise meaning, to go elsewhere in search of conjecture, in order to restrict or extend the meaning. Statutes and contracts should be read and understood according to the natural and most obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending their operation." (Beardstown v. Virginia, 76 Ill., 34; Mc Cluskey v. Cromwell, 11 N. Y., 601.)

The presumption is that language has been employed with sufficient precision to convey the intent. (Cooley's Const. Lim., 55; Hill v. City of Chicago, 60 Ill., 86.) Chief Justice Marshall in the case of Gibbons v. Ogden, 9 Wheat., 188, said, "The framers of the constitution and the people who adopted it must be understood to have employed words in their natural sense, and to have understood what they meant." (See also City of Springfield v. Edwards, 84 Ill., 626, 632.)

In an early interesting case in Massachusetts, the court was called upon to expound the true meaning of that clause of the constitution which required that representa-

tives should be chosen by written votes; and the precise question as presented was whether printed votes are written votes. It was held that "printed votes were legal." In the course of the opinion Chief Justice Parker used the following language: "In construing so important an instrument as a constitution, especially those parts which affect the vital principle of a republican government, the elective franchise, or the manner of exercising it, we are not, on the one hand, to indulge ingenious speculations which may lead us wide from the true sense and spirit of the instrument; nor on the other to apply to it such narrow and constrained views as may exclude the real object and intent of those who framed it. We are to suppose that the authors of such an instrument had a thorough knowledge of the force and extent of the words they employ, that they had a beneficial end and purpose in view, and that more especially in any apparent restriction upon the mode of exercising the right of suffrage, there was some existing or anticipated evil which it was their purpose to avoid." (Henshaw v. Foster, 9 Pick., 312.)

The constitution derives its force from the people who adopted it, and it is the intention of the people which is to be sought for. (Cooley's Const. Lim., 66.) That learned author says, "It is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed." Further, the meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it. (Cooley 55; C. & O. Ry. Co. v. Miller, 19 W. Va., 408.) In this connection Judge Cooley, in his work on Constitutional Limitations, made some observations which are so pertinent that I quote them: "A constitution is not to be made to mean one thing at one time and another at some subsequent time

when the circumstances may have so changed as perhaps to make a different rule seem desirable. A principal share of the benefit expected from written constitutions would be lost if the rules they establish were so flexible as to bend to circumstances, or be modified by public opinion. It is with special reference to the varying moods of public opinion, and with the view to putting the fundamentals of government beyond their control, that these instruments are framed.''

'' What a court is to do, therefore, is to declare the law as written, leaving it to the people themselves to make such changes as new circumstances may require.'' (Cooley, 54, 55.) So the language of the constitution is to be understood in the sense in which it was used at the time when it was adopted. Hale v. Everett, 53 N. H., 9, 125; Opinion of Justices, 126 Mass., 557, 589. Is there ambiguity in the language of the first clause of Sec. 9 of Art. 6, or does it possess a definite and precise meaning? If it is plain, clear, and free from ambiguity, what meaning is expressed thereby? This clause is not connected with any other part of the constitution which tends to explain or modify it. It is an independent provision, and its meaning must be found disclosed within its own terms.

The subject matter of the article in which it appears is suffrage. It prescribes the qualifications of electors. In gathering the intent from the language employed in a law covering that subject, there are certain additional rules of construction which should be observed. Statutes which confer or extend the elective franchise should be liberally construed. Sutherland Stat. Const., 441. The voter must, without any undue straining of the language in any direction, come within the terms of the law, and all reasonable doubts should be resolved in his favor. '' Such is the fair tendency of our institutions.'' The People v. Dean, 14 Mich., 406, 417.

As a reasonable corollary of those principles, we think it should follow that any provision which excludes any,

class of citizens from the exercise of the elective franchise ought to receive a strict construction, without, however, doing violence to or distorting the language, to the end that none shall be held excluded who are not clearly designated. Such a rule would seem to be the natural and reasonable outgrowth of the fundamental principles of our form of government. The sovereignty resides in the people, although, by written constitutions, they have delegated the exercise of sovereign powers to several departments. The people "retain in their own hands a power to control the governments they create as far as they have thought needful to do so, and the three depart ments are responsible to and subject to be ordered, directed, changed, or abolished by them. But this control and direction must be exercised in the legitimate mode previously agreed upon." Cooley's Const. Lim., 598. "Participation in the elective franchise is a privilege rather than a right, and it is granted or denied on grounds of public policy; the prevailing view being that it should be as general as possible consistent with the public safety." Id., 599. The sovereign power residing primarily in all the people, but in fact and practically with those only who possess the right of suffrage, it would seem that none who are not clearly embraced in any restriction upon such right should be excluded.

From an orderly and logical standpoint the initial step in arriving at a correct interpretation of the provision that "no person shall have the right to vote who shall not be able to read the constitution of this State," is an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. Independently of the specification of a particular instrument, which a voter must be able to read, an ability to read necessarily implies some language; but the requirement that a person, as a condition precedent to the right to vote, shall be able to read, is inseparably connected with a definite instrument. The sense in which the framers of the constitution, and the people in adopting it, employed

the phrase, "the constitution of this State," must be determined from a consideration of its relation to the remainder of the clause.

The constitution is mentioned as something which one must possess an ability to read. With this idea ·in view, the true significance of the word "constitution," as used in the section, becomes a matter for serious investigation. In its most general sense a constitution is defined as "that body of rules and maxims in accordance with which the powers of sovereignty are habitually exercised." Cooley's Const. Lim. 2. In a lecture, forming one of a series, delivered by the late Mr. Justice Miller, upon the federal Constitution, he said: "The term ' constitution ' may be applied not improperly to the guiding principles underlying all these varying forms of government, whether they are, or are not, established by ·any written instrument." Miller on the Const., 63.

Comprehensively considered, therefore, a constitution consists in the fundamental principles of government, and, as thus understood, the use of the term would not be inapplicable in referring to almost any kind of established human government. Under such an enlarged definition, however, it might be either written or unwritten. The principles thereof might rest solely upon the will of an absolute monarch. It is manifest that we are not at liberty to entertain so broad a view of the word as it is found employed in the clause under consideration. In this country it is invariably understood and received as indicating something less than that which is embraced within its comprehensive definition.

In the language of Judge Cooley, " In American constitutional law the word ' constitution ' is used in a restricted sense as implying the written instrument agreed upon by the people of the Union, or any one of the States, as the absolute rule of action and decision for all departments and officers of the government, in respect to all the points covered by it, which must control until it shall be changed by the authority which established it."

Cooley's Const. Lim. 3. And Mr. Justice Miller in further defining it, did so as follows : " In America, when we speak of a constitution, we refer to a written instrument, one in which the powers granted and duties imposed by it are reduced to writing ;" and again, "A constitution in the American sense of the word, is a written instrument by which the fundamental powers of the government are established, limited, and defined, and by which those powers are distributed among several departments, for their safe and useful exercise for the benefit of the body politic." And he added, "A search for a more satisfactory definition has been in vain ; but the language, perhaps, fairly expresses the meaning of the term in this country." Miller on Const., 71.

In the case of the State v. Parkhurst, 9 N. J. L., 427, at page 548, the court defined it in the following language: "What is a constitution? According to the common acceptation of the word in these United States, it may be said to be an agreement of the people in their individual capacities, reduced to writing, establishing and fixing certain principles for the government of themselves." It would be difficult to ascribe any different meaning than the American one, as above defined and explained, to the term as it is found in the article on suffrage in our constitution.

When the word was used, the convention was engaged in formulating, and the people afterward in ratifying and adopting, a written instrument containing organic rules for their government. They were proceeding to organize and establish a State, and to lay down in written form certain fixed and inflexible principles and mandates, which should, until legally changed, be adhered to by all departments and officials, and by the people themselves. It is self-evident that the common acceptation of the word "constitution" elsewhere in this country, was the sense in which they understood and employed it in providing that one qualification for an elector should consist in an ability to read the constitution of this State, which

was in writing and existed in no other condition. Thus in giving to the word as large a meaning as it is capable of imparting in its relation to the other words of the section, it signifies a written instrument only. In that sense we have the natural, ordinary, and obvious meaning of the term, and in that sense we are to determine the essential qualities of an ability to read it. Whether a person in reality is capable of reading it by reading a translation in some language other than English, depends upon a correct solution of the question whether such a translation is in fact the constitution, or is in truth and common acceptation a copy of it.

In pursuing such an inquiry the path has been enveloped in some obscurity by the fact that no reference to any particular language is found in the section; and the further fact which seems reasonably certain, that such omission occurred by design. The circumstance which indicates that purpose is the strong probability that the source of our provision is to be found in the constitution of Massachusetts, the phraseology of which closely corresponds to that of our own, but follows the word "constitution" with the words "in the English language," thus explicitly and expressly confining the ability to read to that language. In the place of those added words in the Massachusetts constitution we have used the words, "of this State." Reference to the debates of the constitutional convention discloses that the confessed author of the proposition cited the case of Massachusetts and alluded to the fact that in that commonwealth, a voter was required to be able to read the constitution in English. Such omission under all the circumstances, is supposed to positively indicate not only a purpose to omit the words above mentioned, but an intention, that there need not exist an ability to read in English.

The majority, if not all the members of the court, have been strongly impressed with that argument, and the position has seemed not only plausible but to some extent reasonable. Its very plausibility has courted care-

ful investigation and analysis. It can not fail upon reflection, to be observed that the omission of the words deemed to assume so great an importance, may have designedly and understandingly occurred, but that nevertheless, the fact alone of the omission may not demonstrate with reasonable conclusiveness an intention to depart from the Massachusetts requirement. We must, I apprehend, assume that the convention understood the ordinary import of the language they did employ; and if, without the use of the omitted words the import would be identically the same, it becomes evident that the mere act of omission would not unerringly point to a contrary intention. Placing reliance alone upon the omission, if there is a palpable and definite meaning to be discerned in the language actually used, which would constitute the sense in which such language is commonly accepted, the court would not be at liberty to depart from that meaning. For the very reason that it is possible that the omitted words may have been considered unnecessary, it would be clearly unsafe to impute to even a purposed omission a conclusive indication of but one intent and purpose behind it.

The fact that in the convention the provision of the other State was mentioned, we have also thought disclosed a purpose to otherwise regulate the matter in this State. We are still somewhat of that opinion, but the difficulty in the way of allowing that fact to have more than persuasive influence, rests in the proposition that to do so we must attribute such intention to the convention itself, and to the people adopting the instrument, when it may be true, for all that we can know, that but few may have heard or learned of the remarks referred to. The committee of the convention on suffrage, which reported the article on that subject, and as regards the first clause of Sec. 9, in the condition it is now found, except a provision for its taking effect at a date a few years later, was composed of the author of the proposition, three members of the legal profession, the president of the State university, and the

secretary of the convention, all of them being men of education and ability. With the exception of the gentleman hereinbefore referred to, and one other, none of the committee appear to have given voice to any expression indicative of a purpose to avoid whatever may be the full force and effect of the provision as it stands. The other member above alluded to addressed the convention, but not at length, several times during the consideration of the article on suffrage. He expressed the opinion that many foreign-born citizens who were not conversant with English could read the constitution in their own language, if it was put into that language, and that they would vote the same as others. He subsequently, in voting in favor of the article, stated that the educational qualification was very objectionable to him; but it does not appear whether that was because it went too far, or not far enough. Another prominent member of the committee addressed the convention at some length, and stated that what was desired was that a man should be able to read the ballot that he casts. This same opinion was similarly expressed by at least one other member of the convention during the debates.

The debates of the convention are not a very reliable source of information upon the subject of the construction of any particular word or provision of the constitution. As we understand the current of authority, and the tendency of the courts, they may for some purpose, but in a limited degree, be consulted in determining the interpretation to be given some doubtful phrase or provision ; but, as a rule, they are deemed an unsafe guide. In this case the debates are rather unsatisfactory. It is difficult to reconcile them upon the understanding which may have prevailed respecting the real scope of the educational qualification. There appears to have existed quite a divergence of views concerning the number of persons who would be affected by the provision, and we are at a loss to satisfactorily determine whether that difference of opinion, or rather of statement, grew out of a difference

of conception of the purport of the language or not. So that, even were it entirely proper to extract the intention of the convention from the discussions favoring and opposing the measure, it would, in this instance, be utterly useless to attempt it, with expectation of arriving at any positive or certain result. In fact, counsel on both sides have cited confidently the remarks of various members as supporting their respective views and arguments. Nevertheless, did a determination depend solely upon the intention to be discovered in the proceedings and discussions of the convention, and did it become our duty to locate the preponderance of intent therefrom, we would be inclined to regard them, together with the omission of the words above alluded to, as indicating a purpose on the part of some of the members at least to refrain from requiring an ability to read in English. The effect, if any, which such individual purpose may have upon the real question at bar is to be controlled by the result of a further consideration of the language which was chosen as the ultimate expression of the intention of the framers of the constitution, and the people adopting it.

English was and is the language in common and general use in this State; the legislative enactments from the organization of the Territory had uniformly been expressed and published only in that language. The proceedings of the courts were and are conducted exclusively in English. In the constitutional convention no other language was employed ; the constitution itself being framed and expressed in that language. It has never been promulgated in any other.

These facts, in addition to their influence upon the true meaning of the term "constitution," should also be kept in view if it becomes proper or necessary to go outside of the phraseology to discover the prevailing intent of those who prepared the organic law. Such facts have, therefore, a double bearing ; they serve to illustrate and explain the words themselves, and are factors in the search for any purpose behind them. They are important in either respect.

After much reflection we are constrained to announce ourselves as unable to observe any ambiguity in the words, ''the constitution of this State.'' Under the well-considered definitions above quoted, they possess and convey a meaning which is precise, clear, and certain.

We revert, therefore, to the question whether a translation would constitute a copy of the constitution, in the commonly accepted sense of that word. A ''copy'' is defined as a reproduction or imitation, as of a writing, printing, drawing, painting, or other work of art, so as to have another or others similar to the original. Standard Dictionary. It is a document which is taken or written from another, as opposed to an original. 1 Rapalje & Lawrence L. Dict., 293. To translate is to give the sense or equivalent of, as a word, an expression, or an entire work in another language or dialect. Standard Dictionary, 1917. Hence, to explain by clearer terms, or to express in a different form or style of language. Id.

The question whether a translation constitutes a copy of a book was squarely decided in the case of Stowe v. Thomas, 2 Wallace Jr., 547. That case involved an alleged infringement of the copyright of Mrs Stowe's Uncle Tom's Cabin, the defendant Thomas having made a translation in German. Mr. Justice Grier in the opinion said, '' Now, although the legal definition of a ' book ' may be much more extensive than that given by lexicographers, and may indicate a sheet of music, as well as a bound volume; yet it necessarily conveys the idea of thought, or conception, clothed in language or in musical characters, written, printed, or published. Its identity does not consist merely in the ideas, or information communicated, but in the same conceptions clothed in the same words, which make it the same composition. A ' copy ' of a book must, therefore, be a transcript of the language in which the conceptions of the author are clothed; of something printed and embodied in a tangible shape. The same conceptions clothed in another language can not

constitute the same composition, nor can it be called a transcript, or 'copy' of the same book." And the learned justice refers to a remark of Mr. Justice Willes; viz., " Wherein consists the identity of a book? Certainly, bona fide imitations, translations, and abridgments are different, and in respect of property may be considered new works." Generally speaking, a translation need not consist of transferring from one language into another; it may apply to the expression of the same thoughts in other words of the same language.

We apprehend that if some one should undertake to embody the principles and rules set out in our constitution, in other words of our language, and rewrite the whole instrument by the use of different words, but expressing the same sense, such a work could not in any correct sense, legal or otherwise, be denominated the constitution of this State, or even a copy of it; and it is probable that no one would long contend that it could be. A translation into another language might just as completely preserve, and the work composed of such translation might truly communicate, the sense of the constitution. All its rules, maxims, and definitions might be found therein stated, but it would not be considered a copy. The substance of its mandates would have been copied, but not the words and language. We have shown in an earlier part of this opinion that according to the American understanding of the word, the term "constitution" is not merely the fundamental principles of government, but the written instrument containing them, or such principles reduced to writing. Hence it is clear that a work reproducing such principles only, can not constitute, in any correct sense, a copy of the constitution as it is usually understood and accepted. We are convinced that a copy of that instrument can consist only in a reproduction of the words of which it is composed in the same relation as they are there found, and thus, as a necessary consequence, in the language in which it is written No doctrine of statutory

construction will permit the adoption of loose and reckless expressions, such as calling a "translation" of the constitution a "copy" would amount to.

Again, we search in vain for any provision in the constitution respecting its publication, or the manner in which it shall be promulgated.

Under the provisions for the publishing of the laws enacted at the various legislative sessions, there appearing no express statutory regulation to the contrary, it would doubtless be presumed that they were to be published in the language in which they were written and passed. That presumption has been uniformly acted on by the officials of the executive department. Analogous doctrines are found in the decisions. In the case of Road in Upper Hanover, 44 Pa. St., 277, the court said in considering a notice about roads, which had been published in a German newspaper in the German language, "The law must have a definite meaning, and therefore it can not mean that public notice may be given in any language that one of the parties may choose to employ, but in the ordinary language of the country, which is used in judicial proceedings." In another case we find the following: "When a statute directs a notice to be published in a newspaper, the courts will presume, in the absence of anything to the contrary, that the Legislature designed the notice to be published in the same language as the newspaper itself. They will also presume that the notice is to be given in the ordinary language of the State. The present statute contains no express intimation as to the language in which the notice is to be given, or the newspaper is to be printed. Consequently, the presumptions mentioned arise, and require notice to be given in English in a newspaper printed in the same tongue." Publishing Company v. Jersey City, 54 N. J. L., 437. In the State of Louisiana, under the constitution of 1812, all laws were required to be promulgated and preserved in the language in which the Constitution of the United States is written; and, in construing a statute passed while that constitution

was in force, the court refused to consider, or attach any force to, a French translation, although it is apparent that it was customary for the statutes to be translated into French, but whether with or without legislative authority, we are not informed.     State v. Mix, 8 Robinson (La.), 549.

In the case of People v. May, supra, the Michigan court said that "a constitution is law, the people having been the legislators." In that law — the organic law of the State, which could only have been adopted originally by the people, and is not susceptible of any ultimate change, except with their consent, or more correctly speaking their positive act — no provision was made with reference to the language in which it was to be promul-. gated.     It seems to us that the same presumptions which have been adverted to must be held to apply; and consequently, that it was and is to be published in the English language, the same in which it was written, and which is the language of the country.     It is impossible, therefore, that there can exist any authorized publication of the constitution in any other language, for any purpose of construction or enforcement.

We are not prepared to deny the power of the Legislature to provide for translations of that instrument for some limited purposes; for instance, to inculcate a more general knowledge of its rules and principles, and of the character of our local government.     But, under no circumstances could a court resort to such a translation as possessing any force or authority.     It follows that the word "constitution" mentioned as the instrument which a voter must be able to read, is to be understood and construed with reference to the presumption arising from an absence of authority given by the people to publish it in any language or form other than that in which it was written, and which is the language in common and general use.     The constitution is a law.     It is the fundamental, inflexible law in written form which controls, limits, and orders the powers of all departments of government. We are thus led to inquire regarding the essential fea-

ture of that law, as something which may be read. In what character and form is it endowed with living force? At the outset, this appeared to lead into an original field for judicial investigation. It is comparatively a new question; but at least on two occasions the courts have considered the character and effect of a translation of a statute or law. Those cases are directly in point. In North Baptist Church v. Orange, 54 N. J. L., 111, the legality of a municipal ordinance was involved. The charter required that all ordinances, after their passage, should be published in all three of the newspapers published in the city of Orange. One of the papers was printed in the German language. Another requirement respecting ordinances concerning a public improvement was that a notice of the contemplated improvement should be given by publishing a copy of the proposed ordinance, and a statement of the time and place of the meeting of the common council appointed to consider said ordinance in the same three papers. The notice of the time and place of meeting was printed in the German paper, as in the other two, in the English language, and the ordinance was published in the German newspaper in a German translation only. It was held that the notice of the time and place should have been published in the German paper in the German language, as the statute required its publication in that paper, and a notice requires no collocation of words so long as it conveys a clear notion of its subject, and in a German newspaper the medium through which intelligence is communicated is the German language. In reference to the ordinance, it was held a mistake to publish it in the German language, and that even as a part of the notice it should have been published in the German paper in the English. And the court said, "but a *statute* or *ordinance* has no *legal existence except in the language in which it is passed.* No translation, however accurate, can be adopted in the place of its original text for the purposes of construction in a legal proceeding. Until the Legislature makes a provision for the

printing of ordinances in German newspapers in transla-
tion, it is not perceived how they can be printed otherwise
than *litera et verbis*. The publication of the translation
may be regarded as a proper explanatory adjunct of the
English copy, but can not be accepted as a legal substi-
tute for it.'' In the Louisiana case, State v. Mix, supra,
the court was employed in construing a statute; and a
French translation thereof was called to its attention.
This translation seemed to convey a different meaning
from that of the English text. As, in that State both
languages were in quite general use, a liberal quotation
from the opinion of the court can not fail to be useful.

'' Anterior to the adoption of the constitution, the laws
of the Territory were passed and promulgated in the two
languages ; and our civil tribunals have repeatedly and
invariably decided that the one was as much entitled to
respect as the other. These decisions contain a proper
exposition of the law as it then existed. The constitution,
however, which is the supreme law, appears to have for-
mally abrogated and abolished, what was, no doubt, up
to that time the settled law upon the subject. In the fif-
teenth section of the sixth article of the constitution, it is
enacted that, '' All laws that may be passed by the Legis-
lature, and the public records of the State, and the judicial
and legislative written proceedings shall be promulgated,
preserved, and conducted in the language in which the
Constitution of the United States is written.'' '' The
language here used is as clear and unambiguous as that
found in the section of the act of 1829, on which we have
just been commenting. If all the laws passed by the Leg-
islature are to be promulgated, preserved, and conducted
in the language in which the Constitution of the United
States is written, and that language is English, it is diffi-
cult to imagine how an act which has not been thus pro-
mulgated, preserved, or conducted can be considered as
*possessing the stringent force, power, and effect* which
is necessary *to constitute a law.* It would be a *petitio
principii* to say that it has been promulgated, conducted,

and preserved in the English language, because in that case there would be no necessity of resorting to the French translation."

The opinion from which the above is quoted, it will be observed, distinctly holds that, except as preserved and promulgated in the English language, the statute did not have the force and power of a law. That is equivalent to saying that the translation is not the statute ; and by analogy applied to the matter here under discussion it would follow that a translation of the constitution would not be the constitution. In the State of Connecticut the constitution by an amendment in 1855, provides that " Every person shall read any article of the constitution, or any section of the statutes of this State, before being admitted as an elector." We have not been able to find any report of a judicial construction of that amendment, and have every reason to be satisfied that it has not been before the courts for that purpose; but, so far as we know, the custom in that State has invariably been to require a reading in English, and that it has not been suggested that a reading of a translation would answer the constitutional requirement. The two cases above referred to are the only ones coming to our notice wherein the precise nature of a translation of a law into another language was involved and determined. They refused to brand such a translation as either the law itself or a copy of it. It is essentially something else. It is so entirely distinct from the law that a mention of the latter as an entity considered as a written instrument will not include it. No decision to the contrary has been cited, and we have found none.

From what has been said, the proposition, to us, seems irresistible that to authorize such an interpretation of the constitutional provision as would confer upon a person the right to vote, if he is able to read a translation of the constitution in another language, renders it necessary to entirely depart from the clear, commonly accepted meaning of the language employed, and in doing so, to enter upon

a field of almost boundless speculation, with the reasonably certain assurance that in such an investigation, a like conviction from the ascertainable facts would not be imparted to all minds, however honest and conscientious the investigation may be conducted.

The debates of the constitutional convention have been referred to. In all probability there would occur no disagreement after a careful scrutiny of those debates, regarding the general purpose the convention had in view by the adoption of the educational qualification. Throughout all the discussion, a particular class of voters was prominently mentioned. That was what was called the uneducated foreign element in the coal mining camps along the line of the Union Pacific Railroad. They were, by some, spoken of as ignorant of our institutions, and it was claimed that they were not intelligent voters. It would seem that had it been the positive intention not to deprive a foreign-born citizen of the right to vote, in case he was sufficiently educated in his own language to enable him to read a translation of the constitution, that intention would have been expressed, or some provision would have been made for translations. Had some such provision been made, there might have been room for modifying the ordinary import of the words of the clause. Hanna and Carbon precincts are located in coal-mining towns along the railroad mentioned.

We are not unmindful of the fact that, as reported by one of the newspapers published at the time, at the capital of the Territory public meetings were held in that city previous to the vote of the people upon the question of the adoption of the constitution, which were addressed by prominent men; and that it was publicly stated by two gentlemen, one of whom had been a member of the convention, that as to the educational qualification, a reading in English was not required. I have no doubt whatever of the honesty of those statements; and if it were possible to attribute any ambiguity to the words providing such qualification, such statements publicly made would be

strongly persuasive. Nor has it escaped our attention that
so far as public knowledge is concerned, at the elections in
1892 and 1894, and likewise in 1896, except at Hanna
and Carbon precincts, the question of the disqualification of
citizens who could only read a translation of the constitu-
tion was not raised. I am inclined to consider it as a
matter of common knowledge that such persons were
without objection allowed to vote at the elections men-
tioned. Nevertheless, that practice has not been indulged
in for such a length of time as to give it a controlling
effect in the interpretation of what must be regarded as
an unambiguous constitutional mandate. City of Chicago
v. Mc Coy (Ill.), 11 L. R. A., 413. For the reason that
at least a majority of the court had felt strongly persuaded
by the extraneous circumstances which seemed to point to
a contrary understanding our conclusion has been reached
with some reluctance; but we perceive no possible escape
from it. We can not avoid the clear import and signifi-
cance of the language of the constitution. Upon greater
deliberation, moreover, it has become apparent that, from
the circumstances referred to, there is not a clear indica-
tion of such contrary understanding having been general.
Whatever the actual purpose was, even if there existed at
that time a misconception of the provision, it must bow
to the supremacy of the words themselves. They consti-
tute the only safe and reliable index of the intent and
purposes of the convention and the people.

In view of the probability that any express mention of
the English language was purposely avoided by some per-
son or persons in framing the provision for an educational
qualification, we are not surprised that there has existed
an honest difference of opinion relative to its scope and
effect; and that it has been the subject of inaccurate and
loose interpretation. That any broader construction than
that which the court has placed upon it is loose and
inaccurate, we are convinced; and are, therefore, con-
strained to hold that, in the sense of the constitutional
requirement, no person is able to read the constitution of

this State who can not read it in the English language; and consequently is not entitled to vote, unless such incapacity is the result of physical disability, or such person had the right to vote at the time of the adoption of the constitution. The decision of the court upon questions one and six is, that the 54 and 50 votes respectively, making a total of 104 votes, mentioned in paragraphs five and ten of the statement of facts, were not legal votes. In view of this conclusion, it is not apparent from an inspection of the papers in the case, that a decision upon the questions regarding the votes mentioned in the other paragraphs of the statement, is at all essential to a determination of the cause. We should, therefore, refrain from responding to such questions.

Respecting the number of votes to be deducted from the number counted, returned, and abstracted for the defendant, that becomes a mere matter of calculation, and not being involved in any difficulty, hardly requires direction or advice from this court.

The fourteenth question is, "What judgment should be rendered in this action?" The statute authorizes questions, not cases, to be certified to this court for its decision. It may be said, not improperly, perhaps, that the case is certified for the decision of the supreme court upon certain important and difficult questions, but in the strict sense, the case itself is not brought before us for determination. It is here temporarily awaiting a decision upon the reserved questions. The papers must be here to disclose the fact that the reserved questions are actually involved. In our opinion the fourteenth question is not a proper one for reservation.

CONAWAY, C. J., concurs.

CORN, JUSTICE (concurring).

I concur in the conclusion reached, and very largely in the views expressed in the opinion of the court.

The constitution, Sec. 9, Art. 6, provides that "no person shall have the right to vote who shall not be able to

read the constitution of this State. The provisions of this section shall not apply to any person prevented by physical disability from complying with its requirements." The first and most important question presented is whether certain foreign-born citizens residing at Carbon and Hanna, coal-mining towns in Carbon County, who were not voters in Wyoming at the time of the adoption of the constitution, and who, at the time of the election of 1896, were not able to read the constitution of the State of Wyoming in English, but who could read a proper translation or interpretation of such constitution in the Finnish language, are precluded by the provisions of this section from the right of suffrage.

The rule uniformly laid down by the courts and text writers in interpreting statutes and constitutions is that resort must first be had to the language itself. Sutherland says, " It is beyond question the duty of courts in construing statutes to give effect to the intent of the law-making power, and seek for that intent in every legitimate way. But first of all in the words and language employed; and if the words are free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation. It is not allowable to interpret what has no need of interpretation. The statute itself furnishes the best means of its own exposition; and if the sense in which words were intended to be used can be clearly ascertained from its parts and provisions, the intention thus indicated will prevail, without resorting to other means of aiding in the construction." Sutherland Stat. Const., Sec. 237. He says further, " And one who contends that a section of an act must not be read literally must be able to show one of two things, either that there is some other section which cuts down or expands its meaning, or else that the section itself is repugnant to the general purview." Id., 238.

That which the words declare is the meaning of the instrument, and neither courts nor legislatures have a

right to add to or take away from that meaning. Cooley's Const. Lim., 70.

The plaintiff contends that to qualify a citizen for the suffrage in this State, he must be able to read the constitution of the State in the English language. While upon the other hand it is contended by the defendant that the citizens in question, though unable to read the constitution in English, are yet qualified voters, being able to read a translation or interpretation of it in the Finnish language.

Considering the question in the light of the principle, and according to the rule above stated, if the language were simply that the voter must be able to "read," without specifying the particular language or the particular instrument to be read, the meaning might be deemed less clear. Yet even in cases where an act is required to be done and the language to be employed is not specified, it has been uniformly held, so far as I have been able to find, that where the judicial language of the State is English, that language is intended, and must be employed. In Texas, where one of the qualifications of jurors was the ability to read and write, without specifying any language, it was held that the English was intended, and that a citizen was disqualified as a juryman unless he was able to read and write English. Nolan v. State, 9 Tex. App., 423; Garcia v. State, 12 Tex. App., 339.

In Pennsylvania, where publication of a notice "in a newspaper" was required, not specifying the language to be used, it was held that English was intended, and that publication in a German newspaper was not a compliance with the law, although German was largely used in the particular locality, and the court in the same opinion referred to the propriety and necessity of a proper statute authorizing a publication in German. Road in Upper Hanover, 44 Pa. St., 277.

In New Jersey, where a statute directed publication in a newspaper, without specifying in what language, the court held that it must be in English, the ordinary language of the State. Publishing Co. v. Jersey City, 54

N. J. L., 437.   And the same point was again decided in the same way in Nelson v. Trenton, 56 N. J. L., 469.

In Wisconsin, where the language in which the required publication should be made was not specified, it was held that *if the publication was made in English,* a city council might also authorize a publication in a German newspaper.   Kellogg v. City of Oshkosh, 14 Wis., 684. Indeed, I have found no case where the question has arisen that it has not been decided, either expressly or by implication, that where no language is named, the English, the language of the country, is intended.

But the requirement of the constitution is much more than that the voter shall simply be able to read.   It is that he shall be able to read a particular instrument — "the constitution of this State."   These additional words can not be treated as mere surplusage, and rejected from our consideration.   They have some meaning, and in interpreting them the question immediately and necessarily arises, What is the constitution of Wyoming, which this clause requires the citizen to be able to read to qualify him for suffrage? The answer is drawn from the common knowledge of the people, and which courts and juries are supposed to possess, and must apply in reaching their decisions.   It is an instrument written and adopted in the English language, the judicial language of the State.   The requirement is not that the voter shall have studied, or shall understand and comprehend the contents or substance of it, but that he shall be able to read the specific instrument.   He must have that much and that character of education.   To construe a reading in any other language than the English to be sufficient, something must be added to the section, so that it would read in substance: "No person shall have the right to vote who shall not be able to read the constitution of this State, *or a translation thereof.*" It needs no argument to establish that a translation is not *identical* with the original.   No matter how *similar* it may be in meaning, it is plain it can not be *identical* — it is not the instrument, but a translation or interpretation

of the instrument. A copy of a Finnish, Russian, or German translation would not be a copy of the constitution, and the officer would be rash who would certify it as such. Cooley says, "In interpreting clauses, we must presume the words have been employed in their natural and ordinary meaning;" and he quotes the language of Chief Justice Marshall that the framers of the constitution, and the people who adopted it, "must be understood to have employed words in their natural sense, and to have intended what they have said." Applying this rule and neither adding to nor taking away from that meaning, it can not be said that one who is able only to read a translation of the instrument fills the requirement of this provision, that he must be able to read the instrument.

The argument might, if necessary, be much extended. Not only is a translation not identical in the sense of being the same in words, but it is uniformly recognized that it is not precisely similar in meaning, and in the nature of things in any extended composition can not be. Many English words have no precise equivalent in other languages, for the reason that the ideas expressed by them are not familiar to the people who speak those languages. It is plain that a people having no knowledge of the steam engine would have no word to express or describe it. And it is equally clear, I think, that civil liberty as it exists in the States of America being unknown to the subjects of a despotic government, they could in the nature of things, have no word or phrase in their language to describe or define it; and the very word "constitution" when translated into their language, would of necessity convey the idea of a grant or concession from the ruler, rather than the idea of an instrument declaring the organic law, made by the people themselves and binding upon the people and their rulers alike. So that to hold that the ability to read a translation in such cases would meet the requirements of the section, would necessitate a still greater alteration in its words, so that the section would then in substance read: No person shall have a right to

vote who shall not be able to read the constitution of this State, *or a translation of so much thereof as is capable of being translated into such person's own language.*

This is not only the reasonable view, but the one supported by authority. In the case of State v. Mayor of Orange, 54 N. J. L., 112 (22 Atlan. R., 1004), the charter of the city required that public notice of a contemplated improvement should be given by publishing a copy of the proposed ordinance, and that the said notice should state the time and place of the meeting of the council to consider the said ordinance. The charter also provided that these notices should be published in all three of the newspapers of the city, one of which was published in the German language. The court held that the notice published in the German newspaper must be in the German language, as otherwise it would not be "published," but only "printed." But that the copy of the ordinance required to be inserted in the notice in such German paper must be in the English language. The court further say: "Again, the charter requires all ordinances, after their passage, to be published in the same three papers. This ordinance was published in a German translation only. I think this was also a mistake. There is a manifest distinction to be observed between the publication of a notice and the publication of an instrument or statute or ordinance. A notice requires no particular collocation of words, so long as it conveys a clear notion of its subject; but *a statute or ordinance has no legal existence except in the language in which it is passed.* No translation, however accurate, can be adopted in place of its original text, for the purposes of construction in a legal proceeding. Until the Legislature makes a provision for the printing of ordinances in German newspapers in translation, it is not perceived how they can be printed otherwise than *litera et verbis.* The publication of the translation may be regarded as a proper explanatory adjunct of the English copy, but can not be accepted as a legal substitute for it. This view of the manner in

which an ordinance should be printed under these conditions applies in some degree to the notice also. As already set forth, the charter requires that, as part of such notice, a copy of the proposed ordinance shall be published. For the reasons already stated this copy should appear in English. The ordinance must be set aside."

This language can not be misunderstood. The court distinctly hold that such an instrument "*has no legal existence except in the language in which it is passed,*—that a translation can not be accepted as a legal substitute for it."

In Stowe v. Thomas 2 Wallace Jr., 547, Uncle Tom's Cabin had been translated into German by the author, and the translation secured by copyright. The defendant made a second translation into German, published it in a Philadelphia newspaper, and was proceeding to secure such second translation by copyright. It was held that such second translation was not an infringement of the copyright of the original, nor, being an independent translation, of the copyright of the first translation. And the court says, "Its identity does not consist merely in the ideas, knowledge, or information communicated, but in the same conceptions clothed in the same words, which make it the same composition. A "copy" of a book must, therefore, be a transcript of the *language* in which the conceptions of the author are clothed; of something printed and embodied in a tangible shape. The same conceptions clothed in another language can not constitute the same composition, nor can it be called a transcript or "*copy*" of the same "*book.*" Id., 565.

The reasoning of these cases applies with full force to what is called "the constitution" under our system of government. It is true that in a general sense a constitution may be defined as "a fundamental law or basis of government," and, as in the case of the English constitution, may be unwritten. But this is not the American sense. Judge Cooley says: "In American constitutional

law the word constitution is used in a restricted sense, as implying the written instrument agreed upon by the people of the Union, or of any one of the States, etc." Const. Lim. 3. Neither is this a mere technical sense of the word. It is the technical and it is the popular sense; it is the only correct legal sense in its context. The requirement being the ability to *read*, the necessary inference is that it is a *written* instrument.

But it is urged with great earnestness that the section must be strictly construed, and no language being mentioned, and the term "to read" being applicable to a reading in any language, it can not be restricted to a reading in the English. It is said, "he must be unable to read the constitution at all, to come within the strict meaning of Sec. 9." That is to say, if by any possible interpretation of the words he can be said to be able to read the constitution, he is not excluded from the suffrage by its terms. This is not a proper application of the rule of strict construction. The court in U. S. v. Wiltberger, 5 Wheat., 95, says: "It is said that, notwithstanding this rule, the intention of the lawmaker must govern. This is true, but this is not a new independent rule which subverts the old. It is a modification of the ancient maxim, and amounts to this: That though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the Legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases which *those* words in their ordinary acceptation, or in that sense in which the Legislature has obviously used them, would comprehend." And in the English case of Nicholson v. Fields, it is said : "I admit that the common distinction between penal and remedial acts; viz., that the one is to be construed strictly, the other liberally, ought not to be erased from the mind of a judge; yet whatever be the act, be it penal, and certainly if remedial, we ought always to look for its true construction. In that respect there ought to be no distinction between a penal and a remedial statute."

The intention of the convention and the people is to be collected from the words they employ. They have used words of definite meaning, legally and commonly well understood. They must be accepted in that sense by the court. No distinction of a strict or liberal construction is involved. If, however, having ascertained the correct meaning of the words in their context, it were reasonably doubtful whether the persons referred to are included, the rule of strict construction would be applied, and they would be excluded from the operation of the section. No such doubt arises in this case, but they are obviously included within the words as interpreted, and have not the right of suffrage under the constitution.

In my opinion the circumstances do not arise which would authorize the court to interpret the section otherwise than by the natural and ordinary meaning of the words themselves; for it can not be shown, as required by the rule as stated by Sutherland before it can be read other than literally, "either that there is some other section which cuts down or expands the meaning, or that the section itself is repugnant to the general purview."

But if it were deemed necessary or permissible to resort to other sources of information to aid in the construction, this view is rather strengthened than otherwise. At the same time there is one suggestion which seems to be, in some measure at least, persuasive of a different view; and that is that this section is modeled upon a similar one in the Massachusetts constitution where the requirement is the ability "to read the constitution *in the English language.*" And it is forcibly urged that the omission of the words, "in the English language," proves the intention of the convention to dispense with that requirement. But it is evident in the first place, that the rule that statutes originally enacted in another State, when adopted, are deemed to be taken with the settled construction given them in the State from which they are copied, has no application; for the converse of the proposition is simply a negative, that not having copied

the original statute we do not adopt its construction.   But
the argument is that the changed phraseology indicates a
change of substance and intent.    It is clear that a change
of the phraseology of an older statute of the same State
by a revision presents a much stronger case than this,
and in discussing that subject, Sutherland says: "The
presumption of a change of intention from a change of
language is of no great weight, and must mainly depend
upon the intrinsic difference as resulting from the modifi-
cation.    A mere change in the words of a revision will
not be deemed a change in the law unless it appears that
such was the intention.    The intent to change the law
must be evident and certain; there must be such substan-
tial change as to import such an intention, or it must
otherwise be manifest from other guides of interpretation,
or the difference of phraseology will not be deemed
expressive of a different intention."    Stat. Const., 256.
And in this case the omission does not of itself furnish an
interpretation of the words as they now stand, and to give
it the greatest weight that could reasonably be claimed
for it, the only effect would be to send the court upon a
search through the journals of the convention to ascertain
what the motives of the convention were in making the
change of language.    This we are not permitted to do
when the words themselves are unambiguous, as they are
in this case.    But, if we should do so, other facts appear
which much outweigh the one named.    The section was
introduced in its present form, and no mention is any-
where made that it was taken from the constitution of
Massachusetts, and the fact that that constitution con-
tains the words, "in the English language," is only once
mentioned in the debates.    The provision was debated at
great length and by a large number of the members, and
the section as it now stands was under fire during the
entire discussion.    And while by the well-settled rules
of construction we would not in any contingency be per-
mitted to recur to the views of individual members, yet it
is easily ascertainable from the debates what the general

purpose of the convention was.   Without any question it was to deny suffrage to a class of foreign birth, who congregated in large numbers in the mining towns, and who, it was claimed, were unfamiliar with our institutions, were unable to vote intelligently, and were and would be voted at the dictation of others.   This class was designated again and again.   At the same time there was expressed in unmistakable terms the greatest disinclination to disfranchise citizens of the United States, whether of native or foreign birth, who were attached to our institutions, acquainted with public affairs, and able to vote intelligently, but who by defect of early education were unable to read.   And the determination not to disfranchise any of the latter, except so far as it might be unavoidable in carrying out the purposes of the convention, was repeatedly expressed, and was clearly shown in the adoption of Section 10 of the same article.   There can be no question of the identity of the class intended to be reached with those whose right of suffrage is involved in this case.   Of the wisdom or justice of the measure this court is not empowered to judge.   But it would be a strange and surprising result if the very class whom the convention purposed to exclude should be adjudged entitled to suffrage, while others, native to the country or thoroughly Americanized by long residence and familiarity with our institutions, and whom the convention desired to exempt as far as possible from the operation of the provision, should be disfranchised.

I am therefore of the opinion that the meaning of the words themselves is clear, and there is no occasion to resort to external aids in their construction; and that if the debates should be resorted to, it would further appear that the words as interpreted express the true intent of the convention and the people.

I also concur in the opinion that an answer to the remaining questions submitted not being necessary to a decision of these cases, they ought not, at this time, to be considered.