**Travis William HODGINS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 97–169.

Supreme Court of Wyoming.

July 16, 1998.

Sylvia L. Hackl, State Public Defender; and Donna D. Domonkos, Appellate Counsel, for Appellant(Defendant).

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; and D. Michael Pauling, Senior Assistant Attorney General, for Appellee(Plaintiff).

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and TAYLOR,* JJ.

* Chief Justice at time of expedited conference.

MACY, Justice.

Appellant Travis Hodgins appeals from the judgment and sentence which was entered after a jury convicted him of aggravated assault and battery.

We affirm.

## ISSUES

Hodgins requests our review of the following issues:

ISSUE I.

Was the appellant denied a fair trial when the State introduced hearsay testimony to buttress its expert's opinion that Tyler's injuries were caused by nonaccidental trauma?

ISSUE II.

Was the appellant denied a fair trial as guaranteed by the due process clauses of the United States and Wyoming constitutions because of prosecutorial misconduct during the opening and closing argument?

ISSUE III.

Did the trial court abuse its discretion when it ordered the appellant to pay for the long term medical costs of Tyler Hodgins when the appellant has no reasonable ability to pay $2,116.66 per month while incarcerated?

## FACTS

Tyler Hodgins was born to Hodgins and his wife on September 19, 1995, approximately five weeks before he was due. Being otherwise healthy, Tyler was born with a clubfoot, and he also developed a mild case of jaundice. Both conditions were being treated when Tyler was sent home from the hospital.

On October 10, 1995, when Tyler was twenty-one days old, his mother left him in Hodgins' care while she attended a class from 6:00 p.m. until 9:00 p.m. Before she left for her class, Tyler was fine. Upon returning home, she noticed that Tyler was irritable, would not eat, appeared limp, and seemed to be having trouble breathing. Hodgins told her that her daughter, who was

then approximately eighteen months old, had fallen on Tyler while he was lying on the couch. Hodgins called the Riverton Memorial Hospital emergency room and described Tyler's symptoms to the nurse. Because Tyler was having respiratory problems, the nurse told Hodgins to immediately bring him to the hospital. Apparently, Hodgins interpreted that to mean they should watch Tyler and bring him to the emergency room if he got worse. The next morning, Tyler's condition was noticeably worse. He was very pale, his right eye was droopy, his breathing was shallow, and he screamed as if he was in pain when his mother picked him up. He was taken to the hospital that morning and was admitted at approximately 9:45 a.m.

At the hospital, the doctors determined that Tyler had a diffuse cerebral edema which involved nearly two-thirds of his brain tissue. They decided to have him flown to Children's Hospital in Denver, Colorado, for specialized treatment.

In Denver, tests revealed that Tyler's brain was dying due to its extreme swelling. Facts which were significant to the diagnosis were that Tyler suffered a severe cerebral edema (swelling of the brain), questionable subarachnoid hemorrhaging (blood between the space of the skull and the lining of the brain), preretinal hemorrhaging (bleeding at the back of the eye), and a subdural hematoma (a collection of blood) without first exhibiting signs of hypoxia (not enough oxygen to the brain). Accordingly, the doctors determined that the most probable cause of Tyler's condition was nonaccidental trauma or, more specifically, shaken baby syndrome. The later discovery of leg and rib fractures was consistent with the diagnosis.

Hodgins explained to the doctors that Tyler's half-sister fell on him while he was lying on the couch. He also related an incident which had occurred one or two days earlier when the sister had either tipped Tyler's cradle over or dropped Tyler while she was lifting him out of the cradle. The doctors believed that these events would not have caused the type of injuries that Tyler was suffering from.

Hodgins was charged with one count of aggravated assault and battery under Wyo.

Stat. § 6–2–502(a)(i) (1997). He was convicted by a jury and ordered to serve a nine- to ten-year term of imprisonment in the Wyoming State Penitentiary. He was also required to pay a maximum sum of $2,116.66 per month for Tyler's long-term care. Hodgins appeals from his conviction.

## DISCUSSION

### A. Hearsay Testimony

Hodgins complains that, while one of the prosecution's expert witnesses, Kent Hymel, M.D., was testifying, the prosecution introduced hearsay testimony through two exhibits. The State counters that the challenged exhibits were admissible under the business records exception to the hearsay rule.

At the pretrial conference and motions hearing in this case, the defense stipulated to the admission of the medical reports and records offered by the prosecution, indicating that they were admissible under the business records exception to the hearsay rule. At the trial, the defense did not object to the exhibits being introduced.

Hodgins specifically complains about Dr. Hymel's references to the prosecution's exhibit number four and the defense's exhibit number 548. With regard to the defense's exhibit, Hodgins challenges the following exchange which occurred between the prosecutor and Dr. Hymel:

Q. (BY [THE PROSECUTOR]) Dr. Hymel, I'm going to hand you what I've— or what has been admitted as Defendant's Exhibit 548. That's the handwritten op[h]thalmological—the handwritten eye consult, isn't it?

A. Yes, it is.

Q. And that document has no date on it, as I think we determined.

A. Not that I'm—not that I see either.

Q. And this eye specialist notes the preretinal hemorrhages, does [he] not?

A. Yes. But ... I don't know this person. I don't know if he's an eye specialist. He's answering in writing an op[h]thalmology report. I'm presuming he is, but I don't know.

Q. Okay. The person who wrote this down, who we assume, since we've—we suggested it came from Children's and it pertains to Tyler—this person notes the preretinal hemorrhages that you referred to yesterday, correct?

A. Yes, he does.

Q. And those are the ones—among those constellation of eye findings, which you told the jury recent literature and in your experience is—that are just a dead ringer, a dead telltale sign for inflicted trauma; is that correct?

A. I didn't use those words—

Q. I know you didn't.

A. —"dead ringer" or "telltale sign," and I don't want to use the words "inflicted trauma." I'm saying they're highly specific for severe trauma, accidental or inflicted.

Q. All right. All right. But this person has an opinion, right, on the second page.

A. Yes. This author wrote an opinion.

Q. And you've told us you don't know this person.

A. Correct.

Q. This is someone else that you're not familiar with at Children's.

A. That's correct.

Q. And what was that person's opinion?

A. *"Compatible with non-accidental trauma."*

Q. *So in other words, another medical person is saying the same thing you're saying.*

A. It appears so.

(Emphasis added.) Regarding the prosecution's exhibit, Hodgins complains about the following discussion which the prosecutor had with Dr. Hymel:

Q. (BY [THE PROSECUTOR]) With respect to State's Exhibit 4, which is the eye consultation, Doctor. In the assessment, the doctor does in fact note those possible causes for the hemorrhaging, retinal hemorrhaging, correct?

A. Yes, he does.

Q. And then there's the last statement [which] says—or it's not the last, Doctor—

yes, it is—Dr. Sargent agreed with the above findings stating that, "The most likely etiology was non-accidental trauma."

Is that correct?

A. That's what's written here.

Q. Do you think it's fair, then, from this document, to take it that that was Dr. Sargent's opinion as the most likely cause?

A. He signed it.

Q. And if I'm reading this right, he did not actually dictate this note, did he? It appears that Dr. Dimartelli actually dictated the note because of the statement, "I reviewed these findings with Dr. Sargent, and he agrees."

A. It appears that. But Dr. Sargent signed it, and therefore is responsible for what is says.

Q. Absolutely. *And that's one more medical person's opinion that the most likely cause was non-accidental trauma, right?*

A. It appears that way.

Q. Officially. And it's possible to conclude that both these op[h]thalmologists had the same opinion.

A. That's possible. But only one person signed it.

(Emphasis added.)

■ Because the defense allowed the challenged testimony to be admitted into evidence without objecting, we must review Hodgins' claimed error under our plain error standard.

A three-part test has been established for determining whether an error may achieve the status of plain error. First, the record must be clear as to the incident which is alleged as error. Second, the party claiming that the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove that a substantial right has been denied him and as a result he has been materially prejudiced.

*Bradley v. State,* 635 P.2d 1161, 1164 (Wyo. 1981). *See also Johnson v. State,* 936 P.2d 458, 465 (Wyo.1997).

W.R.E. 803(6) is a firmly rooted exception to the exclusionary hearsay rule. That rule allows business records which meet certain requirements to escape the exclusionary nature of the hearsay rule.

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

W.R.E. 803(6). Hodgins has failed to demonstrate that the exhibits did not fall within this exception to the hearsay rule. Because the defense stipulated to their admission by virtue of this rule, we are convinced that the defense reviewed and analyzed the documents in light of the requirements of the rule and that it determined they did, indeed, fall within the parameters of this exception. The admission of the challenged testimony did not violate a clear and unequivocal rule of law and, accordingly, did not amount to plain error.

## B. Opening Statement and Closing Argument

Hodgins contends that he was denied a fair trial because, in the prosecution's opening statement and closing argument, the prosecutor interjected his personal beliefs and asked the jury to convict Hodgins for reasons other than that the evidence showed he was guilty beyond a reasonable doubt. We review claims of prosecutorial misconduct by using the following standard of review:

Claims of prosecutorial misconduct are settled by reference to the **entire** record and hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial. Similarly, the propriety of any comment within a closing argument is measured in the context of the **entire** argument.

*Arevalo v. State,* 939 P.2d 228, 230 (Wyo. 1997) (citation omitted).

The defense did not object to the challenged remarks. We, accordingly, must utilize the plain error standard of review which we set out in our discussion of Hodgins' first issue and will reverse only when we find that there was "a substantial risk of a miscarriage of justice." *Dice v. State,* 825 P.2d 379, 384 (Wyo.1992).

The complaint which Hodgins advances with regard to the prosecution's opening statement is that the prosecutor injected his personal beliefs by using the phrase "we believe" twice during a twenty-three-page opening statement. A prosecutor is not allowed to assert his personal beliefs to the jury because the jury may perceive him as being an authority whose opinion carries a greater weight than its own opinion carries. *Barela v. State,* 787 P.2d 82, 83–84 (Wyo. 1990). This Court has recognized that the phrase "we believe" is commonly used in casual conversation and that the infrequent and inadvertent use of this phrase is not prejudicial. *Browder v. State,* 639 P.2d 889, 895 (Wyo.1982).

The portion of the prosecution's opening statement which Hodgins takes issue with is as follows:

The issue of responsibility for that abusive head trauma remains. Who's to blame? Who did this to him, to Tyler? And *we believe* that the defendant did it. We don't, as he did, blame his 18–month-old half-sister. *We believe* that he's responsible based primarily on the fact that, according to his version, which is borne out by other witnesses, he was the sole person

responsible for Tyler's care at a time when he became sick.

(Emphasis added.) After reviewing this portion of the prosecutor's statement in context, we conclude that the phrase "we believe" was used both times to communicate the prosecution's theory that the evidence would show that Hodgins was responsible for Tyler's injuries. This use of the term did not constitute an improper injection of the prosecutor's personal beliefs and did not create a substantial risk of a miscarriage of justice. *See Sturgis v. State*, 932 P.2d 199, 204 (Wyo. 1997); *Fales v. State*, 908 P.2d 404, 411 (Wyo.1995).

Hodgins' difficulty with the prosecution's closing argument is his belief that the prosecutor asked the jury to convict him for reasons other than that the evidence proved he was guilty beyond a reasonable doubt. He maintains that the prosecutor intimated to the jury that the prosecution would not prosecute shaken baby cases in the future if this jury was unwilling to return a guilty verdict, thereby placing the welfare of that community's children upon the jury's ability to return a guilty verdict.

The portion of the prosecution's closing argument which Hodgins takes issue with is set out below:

> So for Tyler Hodgins, and for my office, and for everyone in this courtroom, and for all the citizens of Fremont County, right now you're the law. See, you decide. ***You decide how much protection children are entitled to. You decide how we approach these cases as prosecutors.*** You're the law. And I don't envy you.
>
> ***Have we proved this case? Absolutely. I'll say it one last time. The medical evidence I think is just overwhelming and the time line is fixed. And if we had a camera in the ceiling, I've told you what I think it would show.***
>
> But it's up to you. Now, what's acceptable in Denver, Colorado, what's acceptable in Washington, D.C., . . . what's acceptable in Salt Lake City, . . . they don't matter right now. ***Because you, in a large measure, will determine how we as a community deal with cases of this type.***

Now, I'm not patting myself on the back here, but we haven't turned our back because we didn't have an eyewitness or a confession. And, no, nope, we don't know exactly what happened. And we will never be able to tell you. But is that reason to turn our backs? Huh-uh. No. We're talking about children here. We're not talking about robbing banks and we're not talking about burglarizing cars.

We're talking about giving meaning and substance to those words in that book that says, "If you act recklessly, intentionally, knowingly, and you—you make a mush brain out of a child, ***then we're going to hold you responsible for it in this community.***"

And that's not an easy thing. And no one ever said it is or will be or will ever be. But today, you're the law.

(Emphasis added.)

■■ During closing arguments, counsel may assist the jury by reflecting upon the evidence and drawing reasonable inferences which logically flow from that evidence. *Gayler v. State*, 957 P.2d 855, 861 (Wyo. 1998). Arguments which are designed to appeal to the jury's prejudice or passion are, however, improper. *Id.* The fear in allowing such appeals is that the accused will be convicted for reasons which are wholly irrelevant to his guilt or innocence. *Id.*

■ It is permissible for a prosecutor to ask the jury to rely upon its experience in evaluating the evidence. *Prindle v. State*, 945 P.2d 1180, 1185 (Wyo.1997). It is also appropriate for a prosecutor to comment that the jury should consider the need to protect its community. *See Hopkinson v. State*, 632 P.2d 79, 166 (Wyo.1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). Hodgins, accordingly, has not shown that the prosecutor went beyond acceptable limits in his closing argument or that he created a substantial risk of a miscarriage of justice.

## C. Reasonableness of Sentence

■ Hodgins challenges the reasonableness of his sentence, arguing that the trial

court abused its discretion by ordering him to pay $2,116.66 per month for Tyler's support because he does not have the reasonable ability to pay that amount. He does not cite authority in making his statement that "a sense of reasonableness must come into play at some point and this order can only offend the public sense of fairness."

In the judgment and sentence, the trial court ordered Hodgins to pay long-term physical health care costs for Tyler:

IT IS FURTHER ORDERED you, TRAVIS WILLIAM HODGINS, are to make restitution to the victim, Tyler Hodgins, or his legal representative as set forth herein. The Court has considered the factors enumerated in W.S. § 7–9–106. The Court specifically finds that an Order requiring the defendant to pay long-term physical health care cost to the victim or his legal representative pursuant to the provisions of W.S. § 7–9–113 and § 7–9–114 is appropriate. The Court finds specially and specifically that the sum of $2,116.66 per month should be paid by the defendant as restitution to the victim Tyler Hodgins or his legal representative in order to defray the cost of long-term physical health care for the victim for as long as long-term physical hea[l]th care is required by the victim or until further order of this Court.

IT IS FURTHER ORDERED you, TRAVIS WILLIAM HODGINS, shall pay said amount by paying each month the maximum amount subject to and not exempt from execution pursuant to the statutes of the State of Wyoming not to exceed the sum of $2116.66 per month. . . .

The statutes which the trial court referenced are set out below:

### § 7–9–106. Factors considered by probation and parole officer, and by court

(a) The probation and parole officer or other person directed by the court when assisting the defendant in preparing the plan of restitution, and the court before approving or modifying the plan of restitution, shall consider:

(i) The number of victims;

(ii) The pecuniary damages of each victim including, for those cases within the provisions of W.S. 7–9–113 through 7–9–115, the long-term physical health care cost of the victim;

(iii) The defendant's:

(A) Physical and mental health and condition;

(B) Age;

(C) Education;

(D) Employment circumstances;

(E) Potential for employment and vocational training;

(F) Family circumstances; and

(G) Financial condition and whether the defendant has an ability to pay or whether a reasonable probability exists that the defendant will have an ability to pay.

(iv) Whether compensation has been paid to any victim under the Crime Victims Compensation Act [§§ 1–40–101 through 1–40–119];

(v) What plan of restitution will most effectively aid the rehabilitation of the defendant; and

(vi) Other appropriate factors.

WYO. STAT. § 7–9–106 (1997).

### § 7–9–113. Restitution for long-term care

In addition to any other punishment prescribed by law and any restitution ordered pursuant to W.S. 7–9–102 which did not include long-term physical health care costs, the court may, upon conviction of any misdemeanor or felony, order a defendant to pay restitution to a victim in accordance with the provisions of W.S. 7–9–114 if the victim has suffered physical injury as a result of the crime which is reasonably probable to require or has required long-term physical health care for more than one (1) year.

WYO. STAT. § 7–9–113 (1997).

### § 7–9–114. Determination of long-term restitution; time for order; enforcement

(a) In determining the amount of restitution to be ordered for long-term physical health care, the court shall consider the factors stated in W.S. 7–9–106 together

with an estimated monthly cost of long-term physical health care of the victim provided by the victim or his representative. The victim's estimate of long-term physical health care costs may be made as part of a victim impact statement under W.S. 7–21–103 or made separately. The court shall enter the long-term physical health care restitution order at the time of sentencing. An order of restitution made pursuant to this section shall fix a monthly amount to be paid by the defendant for as long as long-term physical health care of the victim is required as a result of the crime. The order may exceed the length of any sentence imposed upon the defendant for the criminal activity. The court shall include as a special finding in the judgment of conviction its determination of the monthly cost of long-term physical health care.

(b) Restitution ordered under this section shall be paid as provided in W.S. 7–9–108. The restitution order shall be a civil judgment against the defendant and may be enforced by any means provided for enforcing other restitution orders and civil judgments.

Wyo. Stat. § 7–9–114 (1997).

As a result of Tyler's injuries, nearly two-thirds of his brain tissue have been destroyed. He has to endure extensive physical therapy to enable him to perform the most basic functions and to prevent him from permanently losing mobility. In the affidavits from the Wyoming Department of Family Services, Tyler's future long-term health care costs are estimated to be $25,400 per year, or $2,116.66 per month.

The trial court's order requires Hodgins to pay the amount that his financial condition allows him to pay, providing for the contingency that he may be able to pay the $2,116.66 per month in the future. The trial court's order is reasonable given the circumstances of this case. We, therefore, hold that the order is appropriate.

Affirmed.