Gary CAPSHAW, Appellant(Defendant),

v.

The STATE of Wyoming, Appellee(Plaintiff).

No. 98–309.

Supreme Court of Wyoming.

Sept. 6, 2000.

⚷206

Representing Appellant: Tina N. Hughes of Cheyenne, Wyoming.

Representing Appellee: Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Kimberly A. Baker, Senior Assistant Attorney General.

Before THOMAS, MACY *, GOLDEN and HILL, JJ., and ELIZABETH A. KAIL, D.J. (RET.)

MACY, Justice.

Appellant Gary Capshaw appeals from the judgment and sentence which was entered after a jury found him guilty of two counts of possessing a controlled substance with the intent to deliver, one count of possessing a controlled substance which exceeded three grams, and one count of conspiring to deliver a controlled substance.

We affirm.

## ISSUES

Capshaw presents three issues for our analysis:

1. Did the State's offer, and the admission of testimony against Appellant, by two witnesses who had plea bargained to reduce their sentences, violate 18 U.S.C. 201(c)(2) and W.S. 6–5–102(a)(ii), and result in reversible error?

2. Did the State's offer, and the admission of, two witnesses' testimony that they were convicted of offenses arising out of the circumstances leading to Appellant's trial violate Appellant's right to have a trial on its own merits, and did such testimony constitute plain error?

3. Did the State's statements in closing arguments concerning the weight and

credibility of the testimony and evidence constitute prosecutorial misconduct, and result in plain error?

## FACTS

Capshaw's girlfriend rented a room at a motel in Casper on March 2, 1996. The couple spent approximately ten days there during which time the motel manager observed that there was an unusually large number of people visiting their room and that many telephone calls were coming in for them. She also noticed that Capshaw did not park his car in front of his room.

During this period of time, Capshaw rented another room at the motel, explaining to the manager that he was expecting a friend to arrive late during the night and that he did not want to have to wake her when his friend got there. The manager identified this friend as Patrick McDonald.

The manager was concerned about what was going on in the two rooms, and she notified the police of her suspicions about potential drug activity taking place. Agent Craig Malone and Agent Jeff Johnson set up a surveillance of Capshaw's motel rooms on the evening of March 6, 1996. During this surveillance, the agents observed various individuals going to the room.

On March 7, 1996, a search warrant for the two rooms was obtained, and a twenty-four-hour surveillance was established from March 7th through the morning of March 10th. The agents observed a large number of people entering the rooms and noted that they did not stay long.

On March 9, 1996, after completing their surveillance, the agents arrested McDonald. On March 10, 1996, pursuant to the search warrant, agents searched Capshaw's room, his car, and his girlfriend's car. A large triple beam scale and a box of syringes were found in the girlfriend's car. A fake hair spray can smelling of methamphetamine was found in Capshaw's car. In the room Capshaw rented for McDonald, agents found over six ounces of methamphetamine, packaging material, scales, and drug ledgers. In Capshaw's room, they found three and one-

* Retired June 2, 2000.

half grams of methamphetamine in a jacket which belonged to Capshaw, over five grams of additional methamphetamine, four bindles containing approximately one-half to one gram of heroin, a half gram bindle of methamphetamine, a vitamin bottle full of plastic bags which had traces of amphetamine and cocaine on them, a drug ledger, and approximately $2,000 in cash.

Capshaw was handcuffed and advised of his rights. He said he wanted to talk to the agents and was interviewed at the Casper police department approximately thirty minutes after the search began. During this interview, Capshaw said that he had known McDonald for only a few days. He gave names of people with whom he had been involved in buying and selling drugs. Agent Tim Hill testified that Capshaw told him "he could do anybody in this town for drugs and that he would give us more information on McDonald." Agent Hill, however, informed Capshaw that there were not going to be any deals made with him.

Agents interviewed McDonald on March 11, 1996. McDonald told them that he and Capshaw were involved in the distribution of methamphetamine. On August 5, 1996, McDonald "made a Crawford" which Agent Malone described as being "an opportunity to reveal to the government information he might have which would lead to further arrests of co-conspirators. It is an opportunity for him to tell us what he has in order that he might receive levels off of his Sentencing guidelines." McDonald told the agents that he and Capshaw had formed a business relationship for dealing drugs and that they had set up operations at the motel. McDonald subsequently entered into a plea agreement with federal prosecutors wherein he agreed to plead guilty to conspiring to distribute methamphetamine and to testify against Capshaw in exchange for having some charges dropped and receiving a more lenient sentence on the conspiracy charge.

Tina Stinson, one of the individuals who visited Capshaw at the motel, also gave the police information about Capshaw as a result of a plea agreement. She and her husband had been charged with drug related offenses. Stinson entered into a plea agreement wherein she agreed to plead guilty to a delivery charge and to testify in this case or any other case for which she had information in exchange for a conspiracy charge being dropped and two years probation. On March 12, 1996, Stinson told Agent Malone that she and her husband had obtained methamphetamine from Capshaw on numerous occasions.

Capshaw was charged with two counts of possessing a controlled substance with the intent to deliver, one count of possessing a controlled substance which exceeded three grams, one count of delivering a controlled substance, and one count of conspiring to deliver a controlled substance. The case went to trial, and Capshaw was convicted by a jury of all the charges except for the delivery-of-a-controlled-substance charge. He appeals to this Court.

## DISCUSSION

### A. Plea Agreements

Capshaw contends that the evidence about the plea agreements, which McDonald and Stinson had entered into wherein they agreed to testify against Capshaw, violated 18 U.S.C. § 201(c)(2) (1994) and Wyo. Stat. Ann. § 6–5–102(a)(ii) (LEXIS 1999). We disagree.

Capshaw's argument requires us to employ our rules of statutory interpretation. When we analyze statutes, we endeavor to interpret them in accordance with the legislature's intent. *Fall v. State*, 963 P.2d 981, 983 (Wyo.1998). We begin by making an "'inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection.'" *Parker Land and Cattle Company v. Wyoming Game and Fish Commission*, 845 P.2d 1040, 1042 (Wyo.1993) (quoting *Rasmussen v. Baker*, 7 Wyo. 117, 133, 50 P. 819, 823 (1897)). We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statute *in pari materia* so that no part will be inoperative or superfluous. *Fall*, 963 P.2d at 983.

As an initial matter, we point out that McDonald had a plea agreement with federal

prosecutors and not with the state prosecutors. We, therefore, will not consider Capshaw's argument that the state somehow violated 18 U.S.C. § 201(c)(2) and § 6–5–102(a)(ii) with regard to McDonald.

■ Capshaw's argument that the state's plea agreement with Stinson violated 18 U.S.C. § 201(c)(2) and § 6–5–102(a)(ii) is not any more meritorious. Stinson entered into a plea bargain with the state wherein she agreed to testify against Capshaw in exchange for a more lenient sentence for a delivery-of-methamphetamine charge that she was facing and in exchange for the conspiracy charge being dropped. Capshaw contends that, because Stinson was potentially facing ten years in prison on both charges and was afraid of going to prison because she would lose her children, 18 U.S.C. § 201(c)(2), which prohibits giving, offering, or promising anything of value to a witness because of his testimony, was violated. That section provides in pertinent part:

(c) Whoever—

. . .

(2) directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court ... authorized by the laws of the United States to hear evidence or take testimony ...

shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2).

When Capshaw was writing his appellate brief, this provision had been interpreted by the Tenth Circuit Court of Appeals to include plea agreements. The court held that plea agreements which promise leniency to a witness in consideration for his trial testimony are violative of 18 U.S.C. § 201(c)(2). *United ed States v. Singleton,* 144 F.3d 1343 (10 th Cir.1998), *reh'g en banc granted & opinion vacated July 10, 1998.* On January 8, 1999, however, *Singleton* was reversed when a majority of the en banc court held that 18 U.S.C. § 201(c)(2) does not apply to the United States acting in its sovereign capacity and thus does not include an assistant United States attorney who is acting as an alter ego of the United States in offering an accomplice leniency in exchange for truthful testimony. *United States v. Singleton,* 165 F.3d 1297 (10 th Cir.) (en banc), *cert. denied,* 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). We agree with the court's conclusion that to apply this section to a government attorney who is functioning within the official scope of his office would be absurd. 165 F.3d at 1300.

■ Capshaw also contends that Stinson's plea agreement violated § 6–5–102(a)(ii), which provides:

(a) A person commits bribery, if:

. . .

(ii) While a public servant, he solicits, accepts or agrees to accept any pecuniary benefit, testimonial, privilege or personal advantage upon an agreement or understanding that his vote, exercise of discretion or other action as a public servant will thereby be influenced.

Capshaw apparently reads the word "testimonial" to mean testimony at trial and argues that the plea agreements violated the letter and spirit of this section.

After analyzing § 6–5–102(a)(ii), we believe that the legislature was concerned about public officers benefiting their own personal position when it enacted this provision and hold that the word "testimonial" in this context was intended to mean "an expression of appreciation : token of esteem." Webster's Third New International Dictionary 2362 (1961). Plea agreements have long been a sanctioned and useful tool in criminal proceedings, and, if the legislature had intended to outlaw these agreements when it enacted § 6–5–102(a)(ii), it certainly would have been more specific with its language or would have taken some action upon realizing that the use of plea agreements had not ended. We, accordingly, presume that the legislature did not intend to preclude the use of plea agreements and hold that Stinson's plea agreement did not violate § 6–5–102(a)(ii).

## B. Witness Testimony

■ Capshaw claims that the admission of McDonald's and Stinson's testimony that they were convicted of offenses arising out of the circumstances which led to the charges against him violates his right to have a trial on its own merits. He also criticizes many of the prosecutor's statements, arguing that the prosecutor used the guilty pleas of the testifying witnesses to urge the jury to convict him.

■ Capshaw did not object to the challenged testimony or to the prosecutor's comments. Our review is, therefore, limited to a search for plain error.

> A three-part test has been established for determining whether an error may achieve the status of plain error. First, the record must be clear as to the incident which is alleged as error. Second, the party claiming that the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove that a substantial right has been denied him and as a result he has been materially prejudiced.

*Bradley v. State*, 635 P.2d 1161, 1164 (Wyo. 1981); *see also Hodgins v. State*, 962 P.2d 153, 156 (Wyo.1998).

■ When two persons are indicted for separate offenses growing out of the same circumstances, a prosecutor is prohibited from using the fact that one of them has pleaded guilty as evidence against the other. *Kwallek v. State*, 596 P.2d 1372, 1375 (Wyo. 1979). We explained the rationale underlying this rule of law in *Kwallek:* "[C]ompetent evidence against one person charged with an offense is not necessarily admissible against another charged with the same offense. Furthermore, each person charged with an offense must be tried upon evidence tending to show his guilt or innocence." *Id.*

Capshaw does not direct our attention to exactly what testimony he takes issue with, so we will assume it is the testimony about the fact that these witnesses had entered into plea agreements wherein they pleaded guilty to charges against them and agreed to testify against Capshaw in exchange for more lenient sentences. At the trial, Stinson testified on direct examination that she knew Capshaw because she and her husband had bought methamphetamine from him many times. It was during the defense attorney's cross-examination of this witness that the testimony about her plea agreement was elicited. Stinson testified that her husband was serving a term of not less than two years nor more than three years in the Wyoming State Penitentiary because he had been convicted of delivering a controlled substance, and she admitted that she assisted her husband in delivering the methamphetamine. The defense counsel asked Stinson if she had been convicted of selling drugs and inquired about the plea agreement. She testified that she had been charged with conspiring to deliver and with delivering and that she agreed to plead guilty to the delivery charge and testify in this case or any other case for which she had information in exchange for the conspiracy charge being dropped and two years probation.

McDonald testified on direct examination that, as a result of his participation in the activities which underlie the charges against Capshaw, he is serving a seventy-four-month sentence in a federal penitentiary for conspiring to distribute methamphetamine. He testified that his plea agreement required him to plead guilty to the conspiracy charge and to assist prosecutors by testifying against people with whom he was involved when he was selling methamphetamine. He then testified that he and Capshaw dealt methamphetamine together from February 1, 1996, through March 10, 1996. The defense counsel inquired extensively on cross-examination about the plea agreement which McDonald had with federal prosecutors, apparently wanting to inform the jury that McDonald had received a more lenient sentence in exchange for agreeing to testify against Capshaw.

The transcript is clear regarding McDonald's and Stinson's testimony. The first prong of the plain error analysis is, accordingly, satisfied. The second prong of the plain error analysis is also satisfied with regard to McDonald's testimony. The prosecutor elicited evidence pertaining to his guilty plea which is contrary to *Kwallek.*

The second prong, however, has not been satisfied with regard to Stinson's testimony. It was the defense counsel, and not the prosecutor, who elicited the testimony about her plea agreement.

Nevertheless, in both cases, Capshaw has failed to show that he suffered material prejudice as a result of the evidence being admitted. The record clearly reveals that Capshaw's trial strategy was that he was purchasing drugs for his own personal use and that the two witnesses' testimony should not be believed because they had entered into plea agreements in exchange for more lenient sentences. Central to this theory was the evidence regarding both witnesses' plea agreements, and we will not second-guess this often used trial strategy in hindsight. The accused's right to present his theory of the case is well established. *Porth v. State,* 868 P.2d 236, 240 (Wyo.1994). Undoubtedly the testimony from McDonald regarding his plea would have been developed on cross-examination as a part of the defense's strategy had it not been elicited from the state. As it was, the defense thoroughly explored the plea agreement with McDonald. Additionally, the record reveals that, even without considering the evidence of McDonald's and Stinson's plea agreements, ample evidence existed to convict Capshaw of the charges against him, including the testimony from the agents regarding the surveillance of the motel rooms and the physical evidence seized from the rooms which indicated that Capshaw was in the business of selling drugs. We hold that the admission of the witnesses' testimony regarding their plea agreements did not materially prejudice Capshaw's defense and that it, therefore, did not rise to the level of plain error.

 Capshaw also complains about various comments which were made by the prosecutor. One such comment was made during *voir dire.* The prosecutor said, "You will also hear testimony from a gentleman who has already been prosecuted in Federal Court for a series of related offenses named Patrick McDonald." Again, the defense did not object. The comment did not divulge that McDonald was being punished in any way. Rather, it merely informed the jury that McDonald had been prosecuted. The result of that prosecution was not mentioned at this point, and the law of *Kwallek* was not, as Capshaw asserts, violated by the comment.

The remaining remarks which Capshaw challenges occurred during the prosecutor's closing statement. We address various other comments which the prosecutor made during his closing statement in our discussion of the next issue, and we will include the remarks that Capshaw complains about here in that discussion.

## C. Prosecutorial Misconduct

Capshaw contends that the statements which the prosecutor made during his closing argument regarding the weight and credibility of the testimony and evidence constituted prosecutorial misconduct. The state replies that the prosecutor did not urge the jury to convict Capshaw on anything other than the evidence presented against him at trial.

 We review claims of prosecutorial misconduct by using the following standard of review:

> Claims of prosecutorial misconduct are settled by reference to the entire record and hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial. Similarly, the propriety of any comment within a closing argument is measured in the context of the entire argument.

*Arevalo v. State,* 939 P.2d 228, 230 (Wyo. 1997) (citation omitted).

 The defense did not object to the challenged remarks. We, therefore, must utilize the plain error standard of review which we set out in our discussion of the last issue and will reverse only when we find that there was "a substantial risk of a miscarriage of justice." *Dice v. State,* 825 P.2d 379, 384 (Wyo.1992).

 A prosecutor cannot urge his personal beliefs or opinions upon the jury, but he is not precluded from commenting on the evidence and presenting inferences which logically flow from the evidence. *McLaughlin v. State,* 780 P.2d 964, 967–68 (Wyo.1989).

In presenting a closing argument, the prosecutor is entitled to reflect upon the evidence and to draw reasonable inferences from that evidence in order to assist the jury in its function. The purpose of closing argument is to give both the prosecution and defense counsel the opportunity to explain the significance of the evidence and how it should be viewed.

*Jeschke v. State*, 642 P.2d 1298, 1301–02 (Wyo.1982) (citations omitted).

In making his argument, Capshaw presents us with a list of isolated sentences that are highlighted in the following portions of the transcript and declares that the prosecutor either impermissibly asserted his own personal beliefs about the truth or falsity of the testimony and evidence of Capshaw's guilt or he improperly urged the jury to punish Capshaw because others were being punished. For the purpose of our discussion, we have put the challenged remarks in the context in which they were made.

### First challenged remark:

The truth, not what the attorneys say, but the truth. The truth as it comes from this witness stand and the sworn evidence that comes in to this Courtroom. Not in the tales of attorneys of poor addicts who have no money for groceries and things like that as developed by the evidence, but *the truth as developed by the evidence, that Mr. Capshaw is a drug dealer.* That is what he was doing in Casper, Wyoming in March of 1996.

He is not going to invite us in to video tape that, but if you look at the evidence as a whole, if you look at the eye witness testimony, if you look at the partial confession, if you look at the mounds of physical evidence in this case, there is only one reasonable conclusion, that Mr. Capshaw was involved in the distribution of both heroin and methamphetamine and amphetamine.

### Second challenged remark:

As you look at this dresser, you will notice something. The heroin is directly in view. The syringes for using heroin apparently for more than one person are directly in view. The scales for weighing it are directly on top of the dresser. The car keys to the Cadillac and to the room— remember he has just returned from Riverton, Wyoming 15 to 20 minutes before— are both directly on top of it and although there are other rooms or other parts of this motel room, you have heard the evidence, the only relevant evidence was found in this one area of the bedroom. This is a step away from the bed where Mr. Capshaw was present with the jacket with the methamphetamine and amphetamine inside of it. $2,000 in cash was lying under a pair of scissors. Packaging material. As Agent Johnson showed you, they aren't sandwich bags, the corners have been cut out of them so they can twist these together. Spoons which can be used for ingesting the product on the site.

*In addition, we know that he said— and Mr. Malone is right—you just don't trust what the users tell you off the bat,* but if they tell you something that is against their interests without implicating somebody else or if it can be corroborated, it is reliable information, but only to that extent.

He said [the girlfriend] had nothing to do with the stuff in the room.

### Third challenged remark:

They have Mirandized him, talked to him briefly. Did they make threats or promises? He tried to get them to make a promise. He tried to negotiate with them. But *innocent men protest, guilty men negotiate, just like Patrick McDonald did, just like Gary Capshaw did.* There is absolutely no showing that this confession is involuntary.

### Fourth challenged remark:

The question then arises, did he intend to deliver the amphetamine he has in his possession? What he has in his possession is laid out in the lab report itself. As you view the lab report, you'll note that anything marked 200 is Patrick McDonald's room, 300 Mr. Capshaw's room. One item marked 400 is the bindle of heroin found on the person of [the girlfriend] at the time that the room was entered.

He has just over three ounces or three grams of meth in his pocket. He has another approximate half gram.

*You'll find that these folks aren't very true on their weights. They tend to skim them* a bit, containing amphetamine. He has another two plastic bags which contain a mixture of amphetamine and cocaine.

■ **Fifth challenged remark:**

Tina Stinson tells us they knew how to find him there because "He was going around telling people that is where I'm going to be if you need to find me. That is where the Stinsons went because they brought a half ounce the last time, most from Mr. Capshaw, and they were interested in getting high, in getting more."

[She] gave that statement to the police before she made any plea agreement on March 12th.

Now Mr. Custis has tried to make a lot of that, but *the truth is that he didn't listen to Tina Stinson. She said, "Yes, I'm worried about losing my children. I was just worried if I went to jail, I know what happens, they come and get my children."*

■ **Sixth and seventh challenged remarks:**

Now Norm Early used to be the District Attorney in Denver. He used to say, "you can't expect your players to be angels when your play is cast in hell."

When you talk about this case, who else is going to provide Gary Capshaw, a drug dealer, with his drugs? *Who else is going to purchase them but the Tina Stinsons of the world?*

You have a reason to look at that person's testimony hard. You do. Absolutely. *The law says you can base it, convict, based on the uncorroborated testimony of accomplices if you believe them.*

■ **Eighth challenged remark:**

[McDonald] had a couple motives not to [cooperate] with the State in his case. His case is over. He is Sentenced. I can't do a darn thing to him. He didn't get the

Penitentiary he wanted. He has got to worry that if he says something wrong and the feds, if you accuse anybody falsely, if you don't testify truthfully, we are punching your ticket. He had the motive not to be real cooperative. He did testify.

Was the dog in the room or not? We are not worried about that. We are not worried about the dog, we are worried about the dope.

Let's get down to basics. *The basics are that Gary Capshaw was a co-conspirator.*

Now I would say this about possession with intent. It is not how much he intended to deliver but whether he intended to deliver at all. It is not about whether he was the biggest physician in this thing but whether he was a co-conspirator at all.

Let's consider some things, because people don't draw up contracts in this drug world. They don't put things in writing and in fact, after dealing with each other for so long, you know, they pretty much know what to do. Like Tina and Scott Stinson coming back time after time. It is not that they had a specific agreement to get meth from Mr. Capshaw. They just knew that is the place to go if they want to get it and they are going to try it.

■ **Ninth challenged remark:**

We would also like to look at Mr. Capshaw's statement. Now Mr. Capshaw didn't give us a full statement and he was trying to play games with us, and they criticize because it is not tape recorded. But again, how reluctant he was to tell us anything.

*I would suggest to you that Agent Hill probably made the right decision.*

Agent Hill and Agent Malone were both present. He is Mirandized.

■ **Tenth and eleventh challenged remarks:**

He cops to the heroin pretty fast. You can understand why. There he is right there ... There is not much to say on that. He knows Gloria Towner has been out there and starts pitching his name, knows he might talk, so he admits. We get to Pat

McDonald. Well, he says that he has known him but only for a few days.

*Why is he lying about that?* Because he has been involved with Pat McDonald.

When you know somebody for a few days, you don't go down a day or two ahead of them, come in to town and reserve a room for them in somebody else's last name, though. *The truth is what Patrick McDonald said,* they had known each other for some period of time.

### ▇ Twelfth challenged remark:

He then says, "I can tell you all about Mr. McDonald. I can do anybody in town if you, Mr. Hill, will give me the right deal." Tim Hill said, "No, I'm not going to do that.["] After all, who can give him Pat McDonald? *They already have Pat McDonald. He is in jail.*

### Thirteenth challenged remark:

Time after time after time although Mr. [McDonald] is what he is, he is also corroborated time after time. *You heard that they had a plea agreement.* Would you want to give all your information hoping to get some leniency and then the field prosecutor say oh, you didn't tell us the truth about this one, guy, sorry. Thank you for the information. Here is your extra 22 months.

### Fourteenth challenged remark:

You must reach a verdict on each of them. You must approach the evidence as a whole and consider it carefully. We would not ask you to return that, but when you get the kind of physical evidence that you have here, the witnesses, Mr. Capshaw's personal confession, and the testimony of people that are involved in this themselves.

There is only one thing to really do with Mr. Capshaw and that is to hold him responsible. We ask for nothing more than that.

*Just as Patrick McDonald was held responsible, Mr. Capshaw for his role should be held responsible.*

With the exception of the last remark, when the statements are read in context, it is clear that the prosecutor was merely reflect-

ing on the evidence and drawing reasonable and permissible inferences from that evidence. The first remark does not comment on the credibility of any witnesses but rather draws permissible inferences from the evidence. After reading the second and fourth challenged remarks, we do not see how these comments prejudiced Capshaw. Capshaw confessed to delivering a controlled substance, and the prosecutor was simply reminding the jury of this confession in the third challenged comment and that it was made voluntarily. The prosecutor was merely commenting on the evidence when he made the fifth remark. The jurors can certainly decide for themselves what they heard Stinson say. The sixth and seventh comments were logical arguments which were made on the basis of the evidence to combat the defense's implication that Stinson should not be believed because she would say anything to avoid losing her children. The eighth statement was also a permissible comment on the evidence. With regard to the ninth remark, the prosecutor did not comment on the truth or credibility of the witnesses but rather responded to Capshaw's insinuations that his statements should have been tape recorded. The tenth and eleventh remarks were again simply the prosecutor arguing his case to the jury and were reasonable and permissible inferences which flowed from the evidence. In the twelfth and thirteenth statements, the prosecutor was merely commenting on the evidence and explaining to the jury why McDonald did not have a reason to lie.

Other than making a blanket assertion that the statements were violative of *Kwallek* or that they were impermissible comments concerning the weight and credibility of the testimony and evidence, Capshaw has failed to explain with any degree of specificity how these remarks prejudiced his trial, and we refuse to create those arguments for him. We will, however, say that, in the comments thus far mentioned, the prosecutor did not urge the jury to convict Capshaw because McDonald and Stinson were being punished nor did the prosecutor impermissibly comment on the weight and credibility of the testimony and evidence. We, therefore, con-

clude that error did not occur when the prosecutor made the comments.

■■■■ The fourteenth comment raises more concern than the previous remarks because it suggests that, because McDonald was convicted for his role in these illegal activities, Capshaw should also be held responsible for his part in them. As we discussed in the last issue, when two persons are indicted for separate offenses growing out of the same circumstances, the prosecutor is not allowed to use the guilty plea of one against the other. *Kwallek*, 596 P.2d at 1375. Although we conclude that this suggestion was error, we believe that it is harmless in this case. The argument leading up to the remark reminded the jurors that they must approach the evidence as a whole and consider it carefully. Additionally, the evidence pertaining to Capshaw's part in this drug business was significant. We do not believe that the jury convicted Capshaw just because McDonald was being punished for his role in the illegal activities, and we hold that this challenged remark did not substantially prejudice Capshaw's case.

Affirmed.

THOMAS, Justice, concurring specially, with which KAIL, District Judge, Retired, joins.

I am in accord with affirming Capshaw's conviction. I cannot, however, join in that aspect of the opinion that treats the claim of error under *Kwallek v. State*, 596 P.2d 1372 (Wyo.1979). In *Ross v. State*, 930 P.2d 965, 972–73 (Wyo.1996), I reiterated the analysis of *Kwallek* that I advanced in *Urrutia v. State*, 924 P.2d 965, 971–72 (Wyo.1996). I still am satisfied that I articulated in those concurring opinions the correct way in which *Kwallek* should be applied. The net effect is that, in the absence of an objection by the defendant, which was not made in this case, there is no cognizable claim of error in an appeal from a conviction even under the plain error standard. I would hold on that issue that there is no error in the absence of the requisite objection.